L. W. POOVEY v. INTERNATIONAL SUGAR FEED NUMBER TWO COMPANY.

(Filed 12 May, 1926.)

**1. Health—Food—Cattle—Sales—Implied Warranty.**

The implied warranty that food stuff sold for human consumption carries an implied warranty that it is wholesome and not deleterious, does not apply to a sale thereof for cattle, unaided by statute.

**2. Same—Statutes.**

Under the provisions of our statute, C. S., 4724, 4726, 4731, there is an implied warranty that foodstuff sold for cattle is reasonably fit for the purposes intended, and that it is not composed of harmful or deleterious substances that will produce injury or death to the cattle fed therewith.

**3. Same—Evidence—Nonsuit.**

Evidence to show an implied warranty that foodstuff sold to plaintiff was not harmful for cattle; that he had fed this with other foodstuff to his cattle, and some died of ptomaine poison, together with evidence of a chemical analysis by the State chemist showing that the foodstuff complained of was harmless, etc.: *Held* insufficient to be submitted to the jury upon the issue.

CIVIL ACTION before *Lane, J.,* at January Term, 1926, of CATAWBA.

The plaintiff is the owner of a herd of dairy cattle at Hickory, N. C., and the defendant is engaged in the business of manufacturing and sell-

ing dairy feeds. The plaintiff had been purchasing this same brand of feed from the defendant for about eighteen months prior to December, 1925, and had been feeding it to his cattle. He ordered a car of feed from defendant, which arrived at Hickory on or about 5 December, 1924. He testified that at the time of the arrival the "appearance of the feed did not appear like the stuff I had been getting. The bags were dirty and dusty. I have never had a shipment of that appearance before. The bags had been cleaned and seemed to leave a little grease on the side of the car, but was all dusty and sifted out all over the car."

The plaintiff accepted the feed, paid the draft, and took it out to his dairy barn. He then wrote a letter to the defendant, sending a sample of the feed, and the defendant, in reply thereto, stated that its chemist had examined the feed and there was nothing wrong with it, but that they had made a change in the feed by changing the formula in one ingredient, and had substituted therefor another which was of greater feed value, and that he could go ahead and use it. The plaintiff began feeding from this shipment to his cows at the dry barn, and also fed them some "wheat straw and some roughness." The feed was given to all of his cattle.

Plaintiff testified as follows: "I began feeding it to my cattle just as soon as I heard from this company. I haven't the letter. I suppose in about five days—that would be about 15 or 16 December when I began feeding it. It was some time the last of December or first of January when I noticed the cattle showing symptoms of sickness." Dr. E. J. McCoy, veterinary surgeon, was called in to treat plaintiff's cattle some time in January, 1925, and diagnosed the disease as ptomaine poisoning. He further testified that "we usually notice the symptoms develop rapidly, while I think the time would depend on the amount of poisoning. It is generally violent in a little while after we notice the symptoms. I have never seen ptomaine poisoning demoralize the nerves that control the diaphragm before. I can't account for it any other way. I can't say whether it was that or not. It was unusual following that trouble. I never knew of that particular symptom in a case of ptomaine. Ptomaine is brought on by some poison either in food or drink, but it is usually in the eating."

Two of plaintiff's cows died and some of the others became sick, and this suit was brought to recover for the value of the cows that died.

The agent of the defendant, at the time of the death of the cows, took up the remaining feed of the shipment and stored it in the city market of Hickory, and requested the Department of Agriculture of North Carolina to have the feed inspector for the State inspect it.

The inspector for the State testified as follows: "I made a physical examination of the bags and found it in very good condition. It was

wholesome and sweet, no moisture or mould to it at all that I could detect. Thereafter the feed was subjected to a chemical analysis by the feed chemist in the Department of Agriculture of North Carolina, and the analysis of the feed showed that there was no poisonous or deleterious matter in it, and that the substances actually found by chemical analysis were entirely all right and not injurious to cattle. The analysis agreed with the analysis on the tag attached to the bag by the manufacturer." There was evidence tending to show that the neighbors of the plaintiff had purchased some of this feed and that their cows had become sick, though none died. There was also evidence to show that other neighbors had purchased feed from this particular car and fed it to their cattle with no injurious effects whatever.

There was a verdict in favor of plaintiff and judgment thereon, from which the defendant appealed.

*E. B. Cline for plaintiff.*
*Thomas P. Pruitt, Self & Bagby, W. L. Marshall for defendant.*

BROGDEN, J. The merit of this case involves two questions:

(1) Is there an implied warranty in the sale of feed for cattle and the nature thereof?

(2) Is there sufficient evidence of a breach thereof to be submitted to a jury?

"The authorities are numerous that there is an implied warranty that runs with the sale of food for human consumption, that it is fit for food and is not dangerous and deleterious." *Ward v. Sea Food Co.,* 171 N. C., 33.

However, it has been held that this principle does not apply to sales of feed for cattle. For instance, in *Lukens v. Freiund,* 27 Kan., 664, the late *Justice Brewer* reasoned thus: "Upon what ground is an implied warranty rested in the case of the sale of provisions, which does not exist in the case of a sale of other articles? Obviously it is not upon any property grounds, or because thereby the estate of either party is affected; but for reasons of public policy, for the preservation of life and health, the law deems it wise that he who engages in the business of selling provisions for domestic use should himself examine and know their fitness for such use, and be liable for a lack of such knowledge. . . . Regard for human life compels this. If the preservation of human life and health be, as we think it is, the foundation of this exception, then it should not be extended to cases in which human life and health are in no wise endangered."

The *Luken's case* grew out of the fact that a farmer bought a sack of bran. In some way two copper clasps had gotten in the sack of bran. One of plaintiff's cows swallowed the clasps which poisoned and killed her.

The identical principle is held to be the law in *Dulaney et al. v. Jones,* 100 Miss., 835: "It is argued with much ability, by the appellees, that an implied warranty of soundness arises only in cases where the food sold is for human consumption. After a careful consideration of the question, our conclusion is that, according to the weight of authority in this country, there is an implied warranty of soundness in the case of the sale of provisions intended for human food, but with food for other purposes there is no implied warranty of soundness. This is put upon the grounds of public policy, the controlling reason being the regard for human life and for human health."

The facts in the *Dulaney case, supra,* were that the plaintiff sold certain feed stuff for the defendant's mules, and that said feed stuff was decayed, rotten, unfit and unwholesome, causing sickness among the mules and the death of six of them. *National Oil Co. v. Young,* 85 S. W., 92 (cows killed by eating cotton-seed hulls containing nails and pieces of wire); *Newell v. Reid,* 189 Mich., 174 (cows killed by eating bran which contained arsenic); *Coyle v. Baum,* 3 Okla., 695; *Houk v. Byrd,* 105 S. W., 1176; *Piper Co. v. Oppenheimer,* 158 S. W., 777, L. R. A., 1917-F-475; Ann. Cas., 1918-B, 24 R. C. L., 469.

We think that the correct rule of liability governing such cases is thus expressed in the case of *Swift & Co. v. Redhead,* 122 N. W., 140 (Iowa), which involved a sale of cattle feed: "The jury might well have found that the purchase of the blood meal for a particular use known to the seller, and for which the latter assured the buyer it was suitable, and that the buyer relied thereon, and, if so, this amounted to a warranty that the article in question was reasonably fit for the use both contemplated." *Reiger v. Worth,* 130 N. C., 268; *Ashford v. Shrader,* 167 N. C., 45; *Grocery Co. v. Vernoy,* 167 N. C., 427; *Furniture Co. v. Mfg. Co.,* 169 N. C., 41; *Register Co. v. Bradshaw,* 174 N. C., 414; *Farquehar Co. v. Hardware Co.,* 174 N. C., 369; *Swift v. Etheridge,* 190 N. C., 162.

In addition to the implied warranty growing out of such sales, there is also a statutory warranty created by the provisions of C. S., 4724-4726-4731. So that a seller of "commercial feeding stuffs," as defined by law, must supply a product reasonably fit for the use contemplated by the parties, and also such a product as will measure up to the requirements of the statute.

Therefore, the rules of liability in such cases having been established, the vital question to be considered is whether or not, in this particular

case, there was sufficient evidence of a breach of the implied or statutory warranty. The evidence tends to show that in this particular case there were about 400 bags of feed; that plaintiff sold a large portion of the feed to other cattle men, who fed it to their cattle. Some of the cattle in some of the herds, after feeding, showed signs of sickness. In other herds no ill effect was discovered. The plaintiff testified that he began feeding his herd, consisting of about forty head of cattle, about the 15th or 16th day of December, and fed it to all of his cattle. He also testified: "It was some time the last of December or the first of January when I first noticed the cattle showing symptoms of sickness. I can't tell you the exact date." He further testified, referring to the two cows that died, "I also fed them some wheat straw and some roughness." After the cows died the feed then remaining was taken up by the defendant and examined by the feed inspector of the Department of Agriculture of North Carolina. He testified that he found nothing wrong with the bags or with the feed, and that "the analysis agreed with the analysis on the tag." Thereafter a chemical analysis was made and the result thereof described by the witness as follows: "I did not find any poison or deleterious matter in it. As far as the chemical analysis goes the substances that I actually found were entirely all right. I did not find anything that has been found to be injurious to cattle."

The conclusion from the testimony is irresistible that the only evidence of a breach of warranty was the fact that after feeding the product for ten days or more two of plaintiff's cows died from what was diagnosed as ptomaine poisoning. No analysis of the stomach of the dead cows was made, and it appears from the record that the particular cows that died were also fed with "wheat straw and roughness." The mere sickness and death of the cows is not sufficient evidence in itself to establish a prima facie case of breach of warranty. The doctrine of *"res ipsa loquitur"* does not apply to a breach of warranty. *Oregon Auto-Dispatch v. Portland Cordage Co.,* 95 Pac., 499.

There is no more reason to conclude that the cows died from this particular feed than that there was some deleterious or injurious substance in the "wheat straw or roughness" that was fed to them at the same time. "The rule is well settled that if there be no evidence, or if the evidence be so slight as not reasonably to warrant the inference of the fact in issue or furnish more than materials for a mere conjecture, the Court will not leave the issue to be passed on by the jury." *Brown v. Kinsey,* 81 N. C., 244; *Liquor Co. v. Johnson,* 161 N. C., 77; *S. v. Prince,* 182 N. C., 790; *S. v. Martin, ante,* 404. This rule is both just and sound. Any other interpretation of the law would unloose a jury to wander aimlessly in the fields of speculation.

We hold, therefore, that the evidence of the breach of warranty was not sufficient to be submitted to the jury, and that the motion for nonsuit should have been allowed.

We are not inadvertent to the contention of the plaintiff that the letter written by the defendant, after the feed had been delivered, advising "there was nothing wrong with the feed . . . go ahead and feed it," constituted an express warranty. Conceding that this amounted to a warranty, it was not made contemporaneously with the sale, and there was neither allegation nor proof of a consideration to support it. Hence, such a contention is not available in this case. *Underwood v. Car Co.,* 166 N. C., 458.

Error.