SEAWELL, J., dissenting.
CLARKSON and DEVIN, JJ., concur in dissent.
Civil action for recovery of damage for alleged wrongful death. C. S., 160-161.
Plaintiff alleges that the intestate A. H. Mercer was killed on the early morning of 10 July, 1937, at around 3 o'clock, when an engine and train of defendants, and operated by G.S. Stephenson, engineer, ran over him at or near a point some three miles east of Laurinburg, known as Southerland Crossing, and that his death "was caused by the negligence and carelessness of the defendant receivers, and their said engineer, in that while plaintiff's intestate was in a prostrate and helpless condition *Page 644 
on the defendants' said track, the defendants negligently and carelessly ran their engine and train upon and over his body"; in that defendants' engineer failed to have the engine equipped with proper lights, and to keep a proper lookout so that he could and would have observed the intestate to be in a prostrate and helpless condition in time to have avoided running over intestate; and in that said engineer "failed to sound the whistle of said engine" and "to give other warning that might arouse or startle the plaintiff's intestate."
Defendants deny the material allegations of the complaint and plead contributory negligence of plaintiff's intestate in bar of any right to recover herein.
After the institution of the action and answer filed, defendant, G.S. Stephenson, died, and A. A. Webb, who was duly appointed as administrator of his estate, was made a party defendant and came into court and adopted the answer of other defendants.
In reply, the plaintiff alleges that notwithstanding any negligence on the part of plaintiff's intestate, the defendants in the exercise of proper care could and should have discovered that he was in a helpless condition on their railroad track in time to have avoided running over him with their train, and that defendants had the last clear chance of preventing the injury and death of intestate.
On the trial below there was judgment as of nonsuit at close of plaintiff's evidence.
Evidence for plaintiff tended to show substantially these facts as of the date of A. H. Mercer's death, 10 July, 1937: On the Southerland farm in Scotland County, a dirt road "kept up by the State" leading from Highway No. 74 to the old Maxton-Laurinburg road crosses the main line, single track, of Seaboard Air Line Railroad, which runs from Wilmington via
Lumberton, Maxton and Laurinburg to Hamlet, all in North Carolina. The railroad runs east and west and the dirt road north and south. This crossing is known as Southerland Crossing and is located about three or four miles east of Laurinburg, and one and three-fourths miles to two miles east of Dixie Siding, where Mercer was last seen. The railroad is straight and practically level, "no grade much," at this crossing. This condition extends a mile or more in both directions. For the entire width of the road across the track dirt is filled in level with the top of the rails, gradually sloping at the edges down to the level of the railroad ties, four or five inches below, thus forming a fill of that height. Grass was growing between and on the outside of the rails, but not on the road fill.
A. H. Mercer was in good health, one-armed, and weighed about 195 ponds. He lived in the town of Hamlet, and was engaged in the bottling business, selling more than 4,000 cases the month he was killed. *Page 645 
He left home about one o'clock in the afternoon of said date, driving a 1936 maroon Ford car; and about four o'clock next thereafter he appeared in Lumberton at the Green Frog, where drinks and beer were sold, and where he first treated "a bunch in there" to beer, and remained there two or more hours, drinking beer, ten or more bottles, until about dusk "six or seven or eight o'clock" when he left, "pretty drunk," walking up the street north. While at the Green Frog "he had a roll of money on him," and had a twenty dollar bill changed. Thereafter about nine o'clock he was first seen in West Lumberton running through the yard of Ed Parnell, to whom he was slightly related, and in 10 or 15 minutes he appeared bareheaded and in his shirt sleeves on the highway in front of the Parnell house, and on meeting Parnell "made a dive" at, struck and knocked him down, and then ran, striking and cutting his head on a tree. He refused to go to a hospital in an ambulance, but rode into Lumberton with one Jake Regan, a colored man whom he knew, and though the colored man tried to take him to a hospital he refused to enter one. At that time "he was drunk," "in a fighting and pugnacious mood," and "seemed to be bent on fighting with somebody." Through the colored man he hired for five dollars a taxi, driven by Donnie Lee Porter, an Indian boy, to take him to Laurinburg or Hamlet. On the way the taxi first stopped at a filling station just west of Lumberton, where one Prentiss Carter, an Indian, who had not before seen Mercer but who, after asking permission to go with them to Laurinburg, entered the taxi. The next stop was for about 15 minutes at a filling station operated by an Indian about one mile from Pembroke. Mercer went in there and washed the blood off his face, bought some beer and paid for it in change. They traveled, and on the way, Mercer "wanted to turn around and come back . . . wanted to get out . . . wanted to go back to Lumberton . . . but Donnie Lee would not let him. . . . would not bring him back but kept on going" until between eleven and eleven-thirty o'clock they arrived at Bryant's filling station, just east of Laurinburg and about one and three-fourths miles from Southerland Crossing. There Mercer ordered beer and, according to Carter, drank a couple or three and, according to Bryant, an order for two beers and a Coca-Cola was filled and Mercer got out of the taxi with his beer in hand and went to the rear of the filling station, walking along the road leading across the railroad, saying he would be back in a few minutes. At that time he was staggering. So far as the evidence discloses he was not again seen alive. After searching in vain for him with a flashlight a few minutes later, around the back of the filling station and along the railroad, Donnie Lee Porter and Prentiss Carter left about twelve o'clock in the taxi, going toward Lumberton. Carter testified that they came back to Lumberton. One Bruce Peel, *Page 646 
who lived across the railroad about 75 or 80 feet from the right of way from the Bryant filling station at Dixie Siding, and who, on account of the heat of the night, was sitting on his front porch, testified that he saw a yellow car drive up to the filling station, and referring to someone coming out with a flashlight, he said, "I had not seen anyone go either way until they come with the light."
About twelve o'clock when Frank Carmichael, in returning to his farm for another load of cantaloupes which he was hauling, crossed the railroad at Covington Siding, located about two and one-half miles east of Laurinburg and one mile west of Southerland Crossing, "someone got to yelling" at him, "Hey, there," about three times, the voice sounding like it came from "on the south side of the railroad track." After reloading and while he was returning, and before he reached the railroad, close to one o'clock, a freight train passed going west, after which he and some colored men searched up and down the track "to see if they could find any signs of anyone being hurt there, but did not find anyone there."
Further, while Melvin Robinson, who had been packing cantaloupes, was going to his home about a mile from Southerland Crossing, between twelve-thirty and one o'clock, he heard someone "hollering down there . . . did not hear him say any words. Sounded like someone was kind of jolly and hollering."
Also, about three o'clock Bruce Peel, who was at home in bed at Dixie Siding, heard screaming, "sounded like a woman was putting up some screaming east of there. . . . The screaming did not last long . . . was in the direction of Southerland Crossing". . . about two miles away, though he could not locate it.
Another Seaboard freight train, consisting of engine and "more than 15 or 20 cars," going west, running at 20 to 25 miles per hour, with good headlight, operated by G.S. Stephenson as engineer, and on which Jesse Staten was flagman, passed Southerland Crossing at some time that morning variously estimated to have been between three and five-thirty o'clock. This train, after leaving Lumberton, did not stop at Maxton or Southerland Crossing and not until it reached Dixie Siding, where it put off cars at the Morgan Mills. It did not blow for Southerland Crossing. The train could be heard before it could be seen by one 250 to 300 yards away. It was a fair night and the moon was shining; and also, there was fog up toward Maxton and down around Dixie Siding, but it was clear on the hills. The flagman, Jesse Staten, testified that he was riding on the left-hand side of the engine, sitting on the seat, in front of the fireman's box looking out in front, and "Yes, the fog kind of had your view cut off. I could see three or four car lengths, *Page 647 
something like that. . . The headlight was burning all the way from Wilmington. . . . It was in good shape."
Dismembered, mangled and crushed portions of the body, including bits of flesh and blood, and portions and bits of clothing, were found, beginning with blood on inside of rails opposite the east edge of the road fill at Southerland Crossing and extending in a westerly direction for about two miles to Dixie Siding. There was blood all the way across the road fill, and a necktie united, lying stretched out between the rails on the west side of the fill. Two or three steps from the railroad — four or five feet from the end of the ties — were one shoe and "the man's heart" lying in the edge of the weeds. Near Dixie Siding there were found a part of a pair of pants, including the watch pocket in which there was a dollar bill, and another part including the hip pocket in which there were ten dollars in bills, the driver's license and other papers of A. H. Mercer. These parts of clothing were nearer the right-hand rail looking west, and the bits of clothing and flesh found in that vicinity were on the spikes at the right-hand rail.
The grass on the east end of the road fill was mashed down in between the rails, variously described as "about the size of a man's body," . . . "looked like there had been a little scramble on the grass there . . . near the right-hand rail looking west," "looked like it was kind of flattened down . . . right at the crossing . . . might have been a foot or two from the crossing . . . a small place . . . something like 3 to 4 feet in length and not much more than 18 inches or two feet wide . . . long part of it ran up and down the T-irons." Outside of the rail on the north side of the rail road and on the east side of the highway there were some burned match ends, cigarette ends and a cigarette package, opposite the place in the grass above referred to. There was a "gouged out," "scuffed up" place in the dirt on the east side of the road fill next to the grass midway between the rails, something like three inches, deep, "about the size of a good stout man's body, from his belt to his shoulders . . . 18 or 20 inches wide and about 3 feet long." The signs of blood on the inside of rails east of road fill were opposite this place. There was "a little blood on the pilot of the engine, . . . an inch or an inch and a half from the center of the pilot . . . about two inches from the bottom of the pilot. The pilot is kind of V-shaped."
From judgment as of nonsuit at the close of plaintiff's evidence, plaintiff appeals to Supreme Court and assigns error.
This question determines the controversy on this appeal: Is there sufficient evidence to take the case to the jury under the doctrine of last clear chance which is invoked by plaintiff? The court below said "No." With this answer we are in agreement.
The principles of law here involved were recently restated and applied in the case Cummings v. R. R., 217 N.C. 127, 6 S.E.2d 837. What is said there is applicable here.
At the outset let it be noted that this is not a case of a railroad crossing accident. To the contrary, plaintiff contends that at the time her intestate was struck by a train of defendants he was down in an apparently helpless condition on the railroad track east of Southerland Crossing.
No presumption of negligence on the part of defendant railroad arises from the mere fact that the mangled body of plaintiff's intestate was found on the track. This is the uniform holding in the decisions of this Court.Upton v. R. R., 128 N.C. 173, 38 S.E. 736; Clegg v. R. R., 132 N.C. 292,43 S.E. 826; Austin v. R. R., 197 N.C. 319, 148 S.E. 446; Henryv. R. R., 203 N.C. 277, 165 S.E. 698; Rountree v. Fountain, 203 N.C. 381,166 S.E. 329; Ham v. Fuel Co., 204 N.C. 614, 169 S.E. 180;Harrison v. R. R., 204 N.C. 718, 169 S.E. 637; Fox v. Barlow, 206 N.C. 66,173 S.E. 43; Cummings v. R. R., supra.
In Harrison v. R. R., supra, this is said to be the prevailing rule, citing 22 R.C.L., 981, and continuing, "Thus it was held in Ward v. Sou.Pac. Co., 25 Ore., 433, 36 P. 166, 23 L.R.A., 715 (as stated in the third headnote, which accurately digests the opinions): `The finding of the body of a child on a railroad track, where it had been struck by a train, raises no presumption of negligence on the part of the company, although the track was straight and clear, where there is nothing to show the circumstances of the accident, or how long the child had been on the track when struck.'"
As stated in Davis v. R. R., 187 N.C. 147, 120 S.E. 827: "The decisions in this State have been very insistent upon the principle that a pedestrian voluntarily using a line of railroad track as a walkway for his own convenience is required at all times to look and to listen, and to take note of dangers that naturally threaten, and which such action on his part would have disclosed, and if in breach of his duty and by reason of it he fails to avoid a train moving along the track, and is run upon and killed or injured, his default will be imputed to him for contributory negligence and recovery is ordinarily barred."
The doctrine of last clear chance does not arise until it appears that the injured party has been guilty of contributory negligence, and no issue with respect thereto must be submitted to the jury unless there is *Page 649 
evidence to support it. Redmon v. R. R., 195 N.C. 764, 143 S.E. 829;Cummings v. R. R. supra. When the doctrine of last clear chance is relied upon, the burden is on the plaintiff to show by proper evidence.
(1) That at the time the injured party was struck by a train of defendant he was down, or in an apparently helpless condition on the track; (2) that the engineer saw, or, by the exercise of ordinary care in keeping a proper lookout could have seen the injured party in such condition in time to have stopped the train before striking him; and (3) that the engineer failed to exercise such care, as the proximate result of which the injury occurred. Upton v. R. R. supra; Clegg v. R. R., supra; Henderson v.R. R., 159 N.C. 581, 75 S.E. 1092; Smith v. R. R., 162 N.C. 29,77 S.E. 966; Davis v. R. R., 187 N.C. 147, 120 S.E. 827; George v. R. R.,215 N.C. 773, 3 S.E.2d 286; Cummings v. R. R., supra.
The doctrine of last clear chance does not apply in cases where the trespasser or licensee upon the track of a railroad, at the time, is in apparent possession of his strength and faculties, the engineer of the train which produces the injury having no information to the contrary. Under such circumstances the engineer is not required to stop the train or to even slacken its speed, for the reason he may assume until the very moment of impact that such person will use his faculties for his own protection and leave the track in time to avoid injury. Redmon v. R. R.,supra; Rimmer v. R. R., 208 N.C. 198, 179 S.E. 753; Pharr v. R. R.,133 N.C. 610, 45 S.E. 1021; Reep v. R. R., 210 N.C. 285, 186 S.E. 318;Lemings v. R. R., 211 N.C. 499, 191 S.E. 39; Sherlin v. R. R.,214 N.C. 222, 198 S.E. 640.
There must be legal evidence of every material fact necessary to support the issue, and the verdict thereon "must be grounded on a reasonable certainty as to probabilities arising from a fair consideration of the evidence, and not a mere guess, or on possibilities." 23 C. J., 51; S. v.Johnson, 199 N.C. 429, 154 S.E. 730; Denny v. Snow, 199 N.C. 773,155 S.E. 874; Shuford v. Scruggs 201 N.C. 685, 161 S.E. 315; Allman v. R.R., 203 N.C. 660, 166 S.E. 981. See, also Poovey v. Sugar Co.,191 N.C. 722, 133 S.E. 12.
In the Poovey case, supra, it is said: "The rule is well settled that if there be no evidence, or if the evidence be so slight as not reasonably to warrant the interference of the fact in issue or furnish more than materials for a mere conjecture, the court will not leave the issue to be passed on by the jury.' Brown v. Kinsey, 81 N.C. 244; Liquor Co. v.Johnson, 161 N.C. 77; S. v. Prince, 182 N.C. 790; S. v. Martin, ante, 404, This rule is both just and sound. Any other interpretation of the law would unloose a jury to wander aimlessly in the field of speculation."
Tested by these principles, the evidence offered with respect to the movements of the intestate, after he was last seen at Bryant's filling *Page 650 
station, a mile and a half to two miles west of Southerland Crossing, before 12 o'clock on the night preceding the finding of his mangled body on the railroad, is uncertain, conjectural and speculative. The physical facts present no reasonable theory to the exclusion of many others as to the circumstances under which the accident occurred. The crucial questions are these: In what position was intestate when struck by the train? If down on the track, or in an apparently helpless condition, how long had he been in that position before he was struck? As to these questions the evidence is consonant with any of many theories which may be advanced with equal force, but all of which are speculative and rest in conjecture.
The finding of burned match stems, cigarette stems and a cigarette package outside of the rail east of the dirt road adds no certainty to the uncertain factual situation. In the first place, the record fails to show that intestate smoked cigarettes. In the second place, if it had been shown that he did, isn't it more probable that while smoking he would have been standing or sitting than lying down? If he had been smoking while lying down inside the track, is it probable that all the match ends and cigarette ends and the cigarette package should have been thrown outside the rail? Certainly one guess is as good as another — the net result being a guess after all.
Likewise, how and when the grass on the inside of the track came to be mashed down in the manner shown is uncertain and of no probative value. Was the grass mashed by the trampling of someone while standing, or while sitting on the rail? Was it caused by some person sitting or lying down? Or, did someone stop there to smoke and rest from the burden of a load being carried? If either or the other, when was it? Again, any guess is as good as another — a guess after all.
But, supposing the grass was pressed down by the intestate lying there, when was it with regard to the time of the approach of the train that crushed the body? Was he lying there next to the right rail as the train approached? If so, how long had he been there? To answer, calls for more speculation.
It is argued that the scuffed out place in the dirt of the road fill indicated that he was down. To be sure the body was necessarily down when the train passed over it, but the question is, in what position was intestate when struck, and how long had he been in that position? The evidence is silent.
In fine, the probabilities arising from a fair consideration of all the evidence in the case afford no reasonable certainty on which to ground a verdict upon an issue of last clear chance.
Exceptions to evidence are untenable.
The judgment below is
 Affirmed. *Page 651