MOUNT OLIVE MANUFACTURING COMPANY, INC., v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 7 June, 1951.)

**1. Railroads § 4—**

The evidence in this case, taken in the light most favorable to plaintiff, *is held* sufficient to be submitted to the jury on the issue of the negligence of the defendant railroad company in causing a collision with plaintiff's automobile at a grade crossing.

**2. Same—**

Evidence tending to show that an officer of plaintiff corporation was told to move plaintiff's car so that a spur track into the property could be used, that in doing so he had cleared the spur track and was on the siding track when the car was struck by the backing, shifting train, and that under the circumstances, and in accordance with custom, he expected the train to go upon the spur rather than continue upon the siding, *is held* not to disclose contributory negligence as a matter of law on his part in driving the car upon the siding in front of the oncoming train.

**3. Negligence § 10—**

The doctrine of last clear chance does not arise unless a sufficient length of time elapses after plaintiff has put himself in a position of peril by his own negligence for defendant to discover such peril and appreciate plaintiff's danger in time to avert the accident.

**4. Trial § 36—**

It is error for the trial court to submit an issue when there is no evidence to support an affirmative finding thereon by the jury, or if the evidence is so slight as not reasonably to warrant the inference of fact in issue or leaves the matter in mere conjecture.

**5. Railroads § 4: Negligence § 21—**

Evidence tending to show that plaintiff's agent drove plaintiff's car upon a railroad siding such a short distance in front of defendant's moving train that the engineer could not have done anything in time to have

avoided the collision, *is held* insufficient to support the submission of the issue of last clear chance.

**6. Negligence § 22—**

Where the jury answers the issues of negligence, contributory negligence and last clear chance all in the affirmative, and the submission of the issue of last clear chance was erroneous because not supported by the evidence, defendant is entitled to judgment.

JOHNSON, J., dissenting.

APPEAL by defendants from *Carr, J.,* at October Civil Term, 1950, of WAYNE.

Civil action to recover for damage to automobile of plaintiff sustained in collision with engine of defendant allegedly resulting from actionable negligence of defendant.

Plaintiff, in its complaint, makes substantially these allegations: 3. That on 20 January, 1949, at about three o'clock p.m., while defendant, through its railroad employees, was engaged in moving cars in and through Bell Siding and Byrd Spur, adjacent to properties of plaintiff, it moved its engine and one or two cars northwardly into the Bell Siding approximately one hundred feet north of the switch where the Byrd Spur enters into the Bell Siding; that before doing this, defendant through its conductor, in charge of the movement of said engine and cars, instructed S. B. Taylor, officer of plaintiff, to have moved an automobile belonging to Shelton Taylor, which had been parked close to the east side of Bell Siding; that after S. B. Taylor had moved this automobile, he was requested and instructed by the conductor to move the plaintiff's automobile, which was parked in front of plaintiff's office close to the Byrd Spur, in order that defendant's engine and cars, which were then in Bell's Siding, north of plaintiff's office as aforesaid, might be moved into the Byrd Spur, through the switch connecting the two tracks; that S. B. Taylor, pursuant to said request and instructions, proceeded to move the plaintiff's automobile, so located, over the driveway across Bell Siding toward the east side of Center Street "as he had been accustomed to doing on innumerable and similar occasions to enable the said railroad engine and cars to be moved from the Bell Siding into the Byrd Spur track, well knowing that in order to make such movement it was necessary for the railroad employees to shift the switch at the junction of the two tracks before such movement could be made"; that S. B. Taylor, "relying upon said instruction and the fact that the switch had to be changed before such movement of the railroad cars were made, proceeded to drive plaintiff's automobile over the driveway running from plaintiff's property across the Bell Siding to Center Street, in order to get out of the way of the contemplated

movement of the railroad's engine and cars; that just as he was proceeding across said siding the defendant railroad company negligently and carelessly caused its engine and cars to be moved southward without making the required shift for entry into the said Byrd Spur track and struck the side of the plaintiff's automobile with such force that the said automobile was crushed in on its left side, causing great damage to it in the sum of $1074.78."

Plaintiff further alleges in his complaint other grounds, predicated upon the above factual situation, apparently as basis for invoking the doctrine of last clear chance. Of these allegations paragraphs 7 and 8 are as follows:

"7. That, before entering said track, the said S. B. Taylor, in moving the plaintiff's automobile, had been advised by said conductor that the next movement of said engine and cars was to be into the Byrd spur track, and both engineer and the said S. B. Taylor knew that the switch at the junction had to be shifted to enable such entry and knew that such switch had not been shifted.

"8. That the said conductor supervising the movement of said engine and cars and the engineer operating said engine and the switchman on said cars, as well as the plaintiff's official, S. B. Taylor, well knew from previous similar movements that the only and the usual method and place of movement of the plaintiff's automobile from its location in front of plaintiff's offices was from the west side of the said siding and spur tracks over the driveway to the east side of Center Street."

Defendant, answering, denies in material aspects the allegations of the complaint, and pleads in specific detail contributory negligence of plaintiff in bar of his right to recover in this action.

These facts, portraying the scene of the collision, do not appear to be in dispute: The collision occurred on the Bell railroad siding, south of its junction with the Byrd railroad spur, in the town of Mount Olive, in front of plaintiff's office on the west side of the main line of defendant's railroad running from Goldsboro, N. C., to Wilmington, N. C. This main line runs in a general north-south course,—down the middle of Center Street,—the portion of the street on the west side being paved. The Bell Siding branches off the main line on the west side and runs in a northerly direction,—first verging to the westward to and across Center Street, and then, parallel to the main line and along the west side of Center Street to and across Maple Street. Byrd's Spur branches off the west side of the Bell Siding at a point west of Center Street, and runs in southerly direction about parallel to the main line and the street, a short distance to Byrd coal yard in which there was a coal car. The siding and the spur are connected by a switch. The turning of the switch is

required for railroad engines and cars to enter the Byrd spur from the Bell siding.

The office of plaintiff is located on the west side of Byrd spur. The space between the west rail of the spur and the office steps is 13 feet wide on the north, and 10 feet wide on the south. The switch connecting the siding and the spur, as variously estimated by evidence offered by plaintiff, is from 35 or 40 feet, or 50 or 60 feet north of the office. It is "just about even with the factory, maybe a few feet north of it." This building according to measurement made by civil engineer of defendant is 49 feet from center of office. There are dirt roads on both the north and south sides of the office, both of which are used. According to the civil engineer, as witness for defendant, the one on the north, that is, south of the brick building, is 39 feet from the center of the office, and the space between the west rail of the Bell siding and the east rail of Byrd spur, at point where this dirt road crosses, is three feet. And, according to evidence for plaintiff, this space between such rails at point of collision is estimated to be 5 or 6 feet. The gauge of the tracks is 4 feet and 8½ inches. The space in front of the office and over the tracks is level,—for about 40 feet, admitting passage of automobiles. The Company car, the one involved in this action, was parked, headed south on the west side of Byrd's spur, right in front of the Company's office.

Upon the trial in Superior Court, for plaintiff, S. B. Taylor testified: "I am secretary and treasurer of Mount Olive Manufacturing Company . . . As result of what the brakeman said, I moved my son's car. When I moved this car the train, the engine and two cars, backed up . . . to another car . . . the north end of Bell siding. I started back to the office and Mr. Matthis, the conductor, met me about the middle of the street . . . I walked just as straight as I could go to my car and go across and the train was coming down—and I thought the train was going to stop. At that time the train was coming along very slowly . . ." Here the following questions were asked by the court, to which the witness answered as shown: Q. "How close was this car that was hit by the train . . . was that car too close to that track for them to go on the Byrd spur? A. Yes, sir, I have moved it a hundred times, I expect. Q. What did the conductor tell you at that time? A. He told me I would have to move my car, that he was coming in here on Byrd's spur and get that car."

Then the witness continued: "To go to Byrd's spur it was necessary to pull the switch . . . In consequence of what the conductor told me, I went straight to my car. It was cold weather and the car was closed. I turned as quick as I could to get out of the way of the train coming in here . . . My car was hit in south direction . . . After getting in my car I turned immediately to my left. When I came across, the train instead of going in the spur stayed on the main line and struck me just as

I crossed Bell siding . . . I have seen this train shifting in and out of this siding ever since 1911 when I went there . . . Prior to reaching that switch point I would say the train was going four or five miles an hour . . . but about the time he reached the switch he was picking up and going a little faster going out on the main line. From the point I moved my car to the point I was hit on Bell siding is about 12 or 15 feet . . ."

Then in answer to the question by the court: "Had you cleared Byrd's track when you were hit?", the witness answered "Yes, sir" . . . "It is about 5 feet from the point where the tracks separate to the point where I was hit."

Then on cross-examination the witness continued: ". . . The train proceeded northwardly on Bell siding—backing in—Beyond my office it went probably 100 or 150 feet, something like that . . . to couple up some cars back there. The switch post on Bell's siding is something like 35 or 40 feet north of my office. Northwardly beyond that the train went on across the street 150 feet . . . to bring out some empty cars. I don't believe the engine crossed that street, but it might. I never paid no attention to it . . . I don't know whether it was one or two coupled to it; they had one or two on the engine when it backed in . . . I saw the cars when they coupled up, they were up there in front of some warehouses across Maple Street, on the north side of Maple Street. Might have been 200 feet, the length of the engine and tender and a couple of others, then it coupled up two more . . . I saw the train as it proceeded southwardly on Bell siding. I don't think it was going over four or five miles an hour the last time I saw it. I didn't pay any attention to it after I got in the car because I thought he was slowing up to go in Byrd's spur . . . I didn't say I saw the train pick up a little speed. I said it was picking up some when it started out to the main line."

Then upon interrogation by the court the witness answered as shown following: Q. "Do you mean before it hit the car? A. Yes, sir. No, I didn't see the train. I knew it was picking up when I got across there and it was right on me. Q. At the point it passed the switch didn't you know it was picking up? A. Yes, sir, when I was so close on the track I couldn't get off. Q. You didn't know it was picking up until it got right on you? A. No, sir."

Then the witness continued: ". . . I didn't see the train at the point it passed the switch . . . There was nothing between me and train at that point. After I looked I was so close I couldn't help myself. Yes, if I had looked I reckon I could have seen it. I thought he was going to stop there and come in on the switch like he had told me . . . I did not hear the bell ringing . . . I don't know that I did listen for it . . . It was cold and I had the windows of my car up, closed . . . I drove my

MANUFACTURING CO. *v.* R. R.

car off just about as short as I could turn it. The distance between the western rail of Bell's siding and eastern rail of Byrd's spur is I should say about 5 or 6 feet where I crossed; anyway . . . I was clear of Byrd's track when I was hit on Bell's track . . . I knew where the train was when the conductor told me to move the car . . . I looked back and the train was back against the building,—maybe 100 to 150 feet. Yes, I saw the train. Of course I crossed in front of it. I thought he was going to stop at the switch . . . When I left the conductor I saw the train traveling southwardly. Yes, when I crossed in front of it, I saw the train traveling southwardly, but it was on Bell's siding beyond the switch. It wasn't on Byrd's spur. . . . Yes, sir, my car was equipped with a rear-view mirror, and . . . with a side-view mirror . . . Yes, I started my car . . . I did not look in the rear-view mirror . . . I did not look in my side-view mirror . . . I turned to my left . . . I could see clearly up the track . . . I turned onto Byrd's spur before I reached the Bell siding . . . When I pulled my car onto the western rail of Byrd's spur my car was at such angle that I could see to my left, northward. I don't know whether I looked at that point or not. It was a turn for just a second or two, and I didn't see the train until it was about on me. I guess I could have seen that the train was not on Byrd's spur if I had looked, but I wasn't expecting it. I don't know whether I looked or not, but I know it was on me before I saw the train."

And, on re-direct examination, the witness said in pertinent part: "That was the only way I could get out of the way . . . When I left the conductor in the middle of the street I went straight to my office and went to the car as fast as I could walk, got right in the car and turned straight across. I thought he was going to throw that switch and go in Byrd's spur; that's what he told me. My car was straight across Bell's siding when the train struck the car in the middle . . . After my conversation with the conductor, the conductor went right up the track toward the train . . . northwardly toward the switch . . ."

Defendant, reserving exception to denial of its motion for judgment as of nonsuit when plaintiff first rested his case, offered testimony of several witnesses.

For the defendant: A. E. Matthis, conductor on the train #519 testified: "I got off the engine and walked to . . . where the track crossed Center Street . . . I was at this crossing . . . and when the train passed over it, I met Mr. Taylor . . . just a little bit north of Mr. Taylor's office ᵧ . . Mr. Taylor asked me if we were going to use Byrd's spur and I told him we were. As to when we were going to use it, I told him nothing . . . That was the entire conversation . . . At the time of the impact I was at the switch that leads into Byrd's spur . . . north of the impact on the west side of Byrd's spur on the building side . . . The engine was coming

out of Bell's siding and passed me right at the switch . . . I went to the scene after the impact . . ."

Then under cross-examination the witness continued: ". . . I have operated on Bell's siding on different occasions during and since 1949. . . . I was familiar with the surroundings. On other occasions I have told Mr. Taylor we had to use the track and his car was on the track . . . When Mr. Taylor moved that car from in front of the office it was because the car was parked there . . . If a car is parked close to the office porch there is room to get in and out of Byrd's spur . . . When the car had to be moved Mr. Taylor always took the car across the track . . . I didn't see him move it. There was no other way to move it than across the tracks . . . At the time we hit his car we were going to the main line and finish switching . . ." And, again, "The train was about 100 feet north of the switch when I spoke to Mr. Taylor. I think at that time it was standing still. It began to move out just as soon as we could make a couple and reverse the engine and start out. I don't know about Mr. Taylor moving his car because I wasn't up there . . . I was back there at the switch . . . 100 feet from his office . . . I saw the train when it started out. It was moving six or eight miles per hour."

Then as to the distance required to stop, this colloquy between the court and the conductor follows: "Q. It was perfectly dry that day? A. The weather was dry, but I don't know. Q. Don't you know that a locomotive going six miles an hour can be stopped almost instantly? A. The conditions have a lot to do with that if the wheels pick up and slide. Q. I am talking about a fair day as you had with a locomotive of the type you had, going six miles an hour, if it can't be stopped almost instantly? A. It don't take a great sight of space to stop one. Q. It should stop in 6 or 8 feet? A. If the conditions are favorable. Q. You said you had good brakes? A. I don't know anything about that. Q. It should be stopped in 6 or 8 feet? A. I think a train moving at that speed, if conditions are good it ought to stop, yes. Q. 6 or 8 feet?" (No answer.)

W. A. Spencer, as witness for defendant, testified: "I was engineer on train #519 . . . When backing the train from the main line into Bell's siding I had an engine and two cars . . . I proceeded northwardly . . . stopped across a little street at the north end of Mt. Olive Manufacturing Company . . . covered that street crossing. We coupled one car and the trainman gave me the signal to proceed out I turned in my seat and started out . . . the speed of my engine was about five or eight miles an hour. My position in the engine was . . . on the right side. As I reached the switch point the engine was running approximately the same speed . . . The throttle was closed. That means the engine is shut off . . . power is shut off . . . I could see Mr. Taylor's automobile all the way from the point we started back . . . I first observed a movement of

that automobile when I was a very close distance to it, probably five or six feet from the front of the pilot the best I could see it. I observed no signal whatever from the driver of the automobile . . . the bell was ringing—no whistle was blowing. At that point just as the automobile started to move, I applied the brakes in emergency, but I was so close to him the engine couldn't possibly stop in that distance. The distance it takes to stop the engine varies an awful lot; I wouldn't say exactly . . . there is a decline at that point, but the way I feel it stopped reasonably well at that time . . . it actually took 15 or 16 feet to stop the engine. I applied the brakes when his car turned toward the track . . . I saw the car as it was at the Byrd track . . . when it started to move it pulled to its left . . . I had automatic brakes . . . there was nothing else I could have done to stop the engine . . . when it came to rest, the cab of the engine was practically in front of the office . . . at the door . . . and the distance from the cab . . . to the pilot is . . . not over about 15 feet."

Then on cross-examination, the witness continued, omitting repetition: ". . . I did not see Mr. Taylor get in the car . . . I was on the lookout all the time . . . We hit the car as he turned across these tracks . . . practically in front of the office . . . directly across . . . After going in north on Bell's siding I saw the conductor first after the accident . . . I did not get any signal from him."

L. H. Norfleet, also witness for defendant, testified that he was fireman on train #519; that he was sitting on the east, or left side of the engine coming out of Bell's siding, and could not see plaintiff's automobile; that the bell was ringing automatically; that the speed of the engine as it proceeded southwardly along Bell's siding was about five to seven miles per hour; and that at that speed he didn't know exactly what distance it takes to stop the engine.

Defendant renewed its motion for judgment as of nonsuit at the close of all the evidence. The motion was denied, and defendant excepted.

The case was submitted to the jury on four issues, as to (1) Negligence of defendant, (2) contributory negligence of plaintiff, (3) the last clear chance, and (4) damages.

Defendant objects to the submission of the third issue. The court overruled the objection and defendant excepted.

The jury answered the first three issues in the affirmative, and the fourth in specific amount.

Defendant appeals to Supreme Court and assigns error.

*Langston, Allen & Taylor and W. R. Allen for plaintiff, appellee.*
*Bland & Bland and W. B. R. Guion for defendant, appellant.*

WINBORNE, J.   Did the trial court commit error (1) in overruling defendant's objection to the submission of the third issue, that is, as to last clear chance; (2) in overruling defendant's motions, aptly made, for judgment as of nonsuit; and (3) in declaring and explaining the law arising on the evidence with respect to the first and third issues? These are the questions involved as stated by defendant in its brief filed on this appeal.

Considering the second question first: The evidence shown in the record on appeal, taken in the light most favorable to plaintiff, as is done in testing its sufficiency on motions for judgment as of nonsuit, appears to be sufficient to take the case to the jury on the first issue.

Moreover, in the light of the extenuating circumstances under which the agent of plaintiff drove plaintiff's automobile on the track in the face of an oncoming railroad train, as revealed by the evidence shown in the record, the question as to contributory negligence of plaintiff was properly submitted to the jury. *Cooper v. R. R.,* 140 N.C. 209, 52 S.E. 932; *Shepard v. R. R.,* 166 N.C. 539, 82 S.E. 872; *Oldham v. R. R.,* 210 N.C. 642, 188 S.E. 106.

However, as to the first question: We are of opinion and hold that the doctrine of last clear chance is inapplicable upon the facts of record, and that the issue in that respect should not have been submitted to the jury.

It is stated by this Court in *Redmon v. R. R.,* 195 N.C. 764, 143 S.E. 829, *Brogden, J.,* writing, that the doctrine of last clear chance does not arise until it appears that the injured party has been guilty of contributory negligence; that no issue with respect thereto must be submitted to the jury unless there is evidence to support it; and that the burden of such issue, when submitted, is upon the plaintiff.

Moreover, in *Miller v. R. R.,* 205 N.C. 17, 169 S.E. 811, opinion also by *Brogden, J.,* this Court declared that "peril and the discovery of such peril in time to avoid injury constitute the backlog of the doctrine of last clear chance."

And in *Ingram v. Smoky Mountain Stages, Inc.,* 225 N.C. 444, 35 S.E. 2d 337, in opinion by *Barnhill, J.,* it is said: "The practical import of the doctrine is that a negligent defendant is held liable to a negligent plaintiff if the defendant, being aware of plaintiff's peril, or in the exercise of due care should have been aware of it in time to avoid injury, had in fact a later opportunity than the plaintiff to avoid the accident . . . Its application is invoked only in the event it is made to appear that there was an appreciable interval of time between plaintiff's negligence and his injury during which the defendant, by the exercise of ordinary care, could or should have avoided the effect of plaintiff's prior negligence . . . It is what defendant negligently did or failed to do, after plaintiff put himself in peril that constitutes the breach of duty for which defendant is

held liable. To sustain the plea it must be made to appear that (1) plaintiff by his own negligence placed himself in a dangerous situation, (2) the defendant saw, or by the exercise of reasonable care should have discovered, the perilous position of plaintiff, (3) in time to avoid injuring him, and (4) notwithstanding such notice of imminent peril negligently failed or refused to use every reasonable means at his command to avoid impending injury, (5) as a result of which plaintiff was in fact injured," citing cases. To like effect is *Aydlett v. Keim,* 232 N.C. 367, 61 S.E. 2d 109, opinion by *Denny, J.*

The discovery of the danger, or duty to discover it, as basis for a charge of negligence on the part of defendant after the peril arose, involves something more than a mere discovery of, or duty to discover, the presence of the injured person, it includes a duty, in the exercise of ordinary care under the circumstances, to appreciate the danger in time to take the steps necessary to avert the accident. It has been said by the Supreme Court of the State of Washington, in *Hartley v. Lasater,* 96 Wash. 407, 165 P. 106, that "last clear chance implies thought, appreciation, mental direction, and the lapse of sufficient time to effectually act upon the impulse to save another from injury, or proof of circumstances which will put the one charged to implied notice of the situation . . . A mere statement of the rule reveals its inapplicability to a case where the contributory negligence began and culminated without the lapse of appreciable time." See also *Shanley v. Hadfield* (Wash.), 213 P. 932; Annotation 92 A.L.R. 47.

There must be legal evidence of every material fact necessary to support the verdict, and such verdict "must be grounded on a reasonable certainty as to probabilities arising from a fair consideration of the evidence, and not a mere guess, or on possibilities." 23 C.J. 51. *Mercer v. Powell,* 218 N.C. 642, 12 S.E. 2d 227, and other cases, including *Poovey v. Sugar Co.,* 191 N.C. 722, 133 S.E. 12.

In the *Poovey case, supra,* it is said: " 'The rule is well settled that if there be no evidence, or if the evidence be so slight as not reasonably to warrant the inference of the fact in issue or furnish more than material for a mere conjecture, the court will not leave the issue to be passed on by the jury' (citing cases). This rule is both just and sound. Any other interpretation of the law will unloose a jury to wander aimlessly in the field of speculation."

Tested by these principles, there is no substantial evidence that, after S. B. Taylor drove plaintiff's automobile into a place of danger, there was anything defendant could have done to avert the collision between the automobile and defendant's engine.

Indeed, the colloquy between the court and the conductor, as to the distance within which an engine and train of cars traveling at speed of

six miles per hour could be stopped, lacks probative value. In the first place, it does not stand the test of mathematical calculation, even "for just a second or two." In the second place, evidence reveals estimates of the speed of the engine varying from four to eight miles per hour.

Where issue of last clear chance is erroneously submitted, and the jury answers both issues, negligence and contributory negligence in affirmative, and issue as to last clear chance in affirmative, defendant is entitled to judgment. *Reep v. R. R.*, 210 N.C. 285, 186 S.E. 318. So it is in the present case,—the defendant is entitled to judgment.

So holding,—it becomes unnecessary to consider the third question.

Hence the judgment below is

Reversed.

JOHNSON, J., dissenting: This record leads me to the view that the issue of last clear chance was properly submitted to the jury.

It seems to me there was enough evidence on the plaintiff's side to sustain the jury-finding that the engineer, in the exercise of reasonable care, should have stopped the locomotive before striking the plaintiff's automobile. True, the engineer's testimony tends to show he did not have sufficient time to avert the collision. He said: "The front pilot (the cow-catcher of the locomotive) got within 5 or 6 feet of the car before he moved. . . . At that point, just as the automobile started to move, I applied the brakes and emergency, but I was so close to him the engine couldn't possibly stop in that distance. . . . From the point I first saw him move and applied the brakes and emergency, it actually took 15 or 16 feet to stop the engine. Yes, sir, I applied the brakes when the car was turned toward the track."

However, there is substantial evidence tending to support the contrary view, *i.e.*, that enough time elapsed after the engineer discovered, or in the exercise of due care should have discovered the perilous position of plaintiff's .agent, S. B. Taylor, to have enabled the engineer, in the exercise of reasonable care, to stop the locomotive and avert the collision: The engineer testified that after backing northwardly into Bell siding beyond the Byrd spur switch, where he picked up a car at a warehouse, he then proceeded back southwardly toward the spur track switch and the plaintiff's office. He said: "*I could see Mr. Taylor's automobile all the way from the point where we started back southwardly on Bell siding.*" And the plaintiff's witness Taylor, who moved the automobile, said he traveled "about 12 or 15 feet" before he was hit. This contradicts the engineer's statement that the front of the locomotive was only 5 or 6 feet from the automobile before it moved. Moreover, the evidence as to distances on the ground tends to corroborate the plaintiff's evidence that the automobile traveled from 12 to 15 feet, rather than only 5 or 6 feet.

The engineer's statement that he saw the automobile only during the interval it traveled the last 5 or 6 feet, when considered with the rest of his testimony and with the plaintiff's evidence, lends support to the plaintiff's contention that the engineer did not exercise due care to avoid the collision. This is further accentuated by the plaintiff's evidence tending to show that the automobile was pushed 40 feet down the track and that the locomotive brakes were not applied until after the collision. Witness Taylor testified, in part, that the locomotive brakes were not applied until after he was hit: . . . "I heard the brakes when they caught against the wheels and the squealing. You could even see the fire coming from it. I know it and I saw it. My car had been pushed at least 30 feet when I heard that noise. . . . It carried my car southwardly along Bell siding 40 feet before coming to a stop. . . . I don't think it was going over four or five miles an hour the last time I saw it. I didn't pay any attention to it after I got in the car because I thought he was slowing up to go in Byrd's spur." The engineer said the speed of the engine was 5 to 8 miles per hour. The fireman said from 5 to 7 miles.

The following testimony of the conductor also tends to show that the engineer, in the exercise of reasonable care, might have stopped the locomotive during the interval the automobile was traveling the distance of "from 12 to 15 feet": "Q. Don't you know that a locomotive going six miles an hour can be stopped almost instantly? A. The conditions have a lot to do with that if the wheels pick up and slide. Q. I am talking about a fair day (and all the evidence shows the weather was fair) as you had with a locomotive of the type you had, going six miles an hour, if it can't be stopped almost instantly? A. It don't take a great sight of space to stop one. Q. It should stop in 6 or 8 feet? A. If the conditions are favorable. Q. You said you had good brakes? A. I don't know anything about that. Q. It should be stopped in 6 or 8 feet? A. I think a train moving at that speed, if conditions are good it ought to stop, yes. Q. 6 or 8 feet? (no answer)."

Add to this the evidence tending to show that the automobile was parked where it customarily stayed; that it was being moved by witness Taylor at the request of the conductor, so as to free this seldomly used spur track for a shifting operation thereon; that the automobile was being moved across both the spur and the siding tracks, the only way it could be moved, and like it had been moved many times before under similar conditions when the locomotive was to go in the spur track. The automobile was moved according to the established, customary pattern. But contrary to the customary pattern, the locomotive this time did not go in on the spur track,—and that's the heart of this case. It passed the switch and struck the automobile on the other track,—on the Bell siding track. Why the trainmen did not follow the usual pattern, Mr. Taylor,

in driving the automobile out of the way, knew not. Before he got in the automobile he saw the conductor going toward the switch, as if to throw it and turn the locomotive in on the spur, as was usually done. Why the switch was not thrown this time does not appear. The conductor said he was standing there at the switch. All of this was calculated to lull Mr. Taylor into a sense of safety. It should have spurred the engineer's call to diligence.

This evidence, it would seem, was enough to sustain the jury in finding, as they did, that the engineer, in the exercise of due care, should have averted the collision. I am constrained to so vote.