**HENGES COMPANY, Inc., a Corporation, Appellant,**

v.

**FORD MOTOR COMPANY, a Corporation, and Mendenhall Motor Company, Respondent.**

No. 53906.

Supreme Court of Missouri, Division No. 2.

Sept. 8, 1969.

Thompson, Walther & Shewmaker, Richard D. Shewmaker, Lewis M. Blanton, St. Louis, for Appellant.

Coburn, Croft, Kohn & Herzog, Alan C. Kohn, John R. Musgrave, St. Louis, for Ford Motor Company.

Stemmler & Stemmler, George L. Stemmler, James A. Stemmler, St. Louis, for Mendenhall Motor Company.

STOCKARD, Commissioner.

In plaintiff's suit for damages in the amount of $50,000 for breach of warranty of fitness of eight trucks for a particular purpose, the trial court directed a verdict for defendants, and plaintiff has appealed.

Plaintiff is engaged in supplying building materials consisting primarily of insulation and acoustical materials, partitions, and floor coverings. Mr. J. G. Henges, Jr., vice president and general manager of plaintiff, asked Mr. Ben Overhoff, truck manager for Ford Motor Company, and Mr. Carl Cooper, truck manager for Mendenhall Motor Company, a Ford dealer, to analyze the requirements of plaintiff and recommend the truck equipment it should use. After a number of conferences Mr. Overhoff and Mr. Cooper jointly recommended that plaintiff purchase eight Ford C–700 tilt-cab trucks with single speed axles, five speed transmissions, and "H.D. 4 V–8 cylinder" engines. Relying on these recommendations plaintiff purchased from Mendenhall five C–700 van type trucks and three C–700 tractor type trucks with the recommended specifications. On behalf of plaintiff Mr. Henges signed two purchase orders, on the back of which was printed an express agreement as follows: "Dealer warrants to Purchaser * * * each part of each Ford Motor Company product sold by Dealer to Purchaser to be free under normal use and service from defects in material and workmanship until such product has been driven, used or operated for a distance of four thousand (4,000) miles or for a period of ninety (90) days from the date of delivery to Purchaser, whichever event first shall occur. * * * This warranty is expressly in lieu of all other warranties, express or implied, and of all

other obligations or liabilities on the part of Dealer, except such obligation or liability as Dealer may assume by its Authorized Ford Dealer's Service Policy or separate written instrument."

The trucks were delivered to plaintiff the latter part of June or the first part of July 1960. According to Mr. Henges, "We started out with excessive repairs immediately. I remember the trucks had to have main bearings replaced; we had fuel pump troubles." During the warranty period the trucks were taken to Mendenhall for needed repairs and they were fixed without cost to plaintiff. After the warranty period trouble continued to develop. Mr. Henges testified that "within the first year of operation" it became "apparent" that the trucks "would not do the job that Ford had said they would." By reason of this testimony the trial court refused to admit evidence of repairs to the trucks after July 1, 1961, to show damages resulting from the alleged breach of warranty. This was based on the general rule, as stated in 77 C.J.S. Sales § 378, that "The buyer of a machine is not entitled to recover from the seller the cost of repairs to the machine where parts broke when he was trying to use it for a particular purpose some time after the buyer had discovered the breach of the seller's warranty as to the fitness of the machine to such purpose, the loss being the result of the buyer's use of the machine after knowing its condition and not the proximate result of the breach of warranty." We will set forth the essential evidence of plaintiff which was admitted, and then state the substance of plaintiff's offers of proof.

Mr. Henges made several complaints to Mendenhall about what he considered to have been excessive repairs on the trucks, and in July 1961 he asked that a meeting be had to determine the cause. There was no response to this request, and plaintiff stopped sending its trucks to Mendenhall and had the repairs made at other places. In July 1963, plaintiff wrote a letter to Mendenhall concerning "three C–700 Ford de-

livery trucks" in which it was stated that the "repair costs on these 3 trucks show we have spent almost $10,000 in keeping these three engines and drive trains in operation." Complaint was made that "the Ford people are unwilling to sit down and discuss our problems with us," and it was requested that Mendenhall, as the "selling dealer," see what could be done. Thereafter, Mr. Over-hoff examined invoices for repairs on the trucks, and according to Mr. Henges, he made a list of "what he considered * * * excessive repairs." Some of the items on this list, without some explanation, would not indicate "excessive" repairs. For example, as to one truck it is shown that 14 months after delivery there was a "minor engine tune," and 26 months after delivery something was done to "points and plugs" and that there was a "check for miss in engine." As to another truck, 23 months after delivery, there was a "service call to start truck-clogged fuel line filter." The list includes many other similar items, but it also includes items such as "new engine and replace fly wheel" and "overhaul engine and replace crankshaft and clutch." Plaintiff's evidence was that "normal" expense of mechanical repairs for the trucks should be approximately 3 to 4¢ per mile. It was not stated whether this was the normal expense for the life of a truck, or for a certain period after it was first placed in use. No records were available as to one of the trucks for the first year of operation, but the expense for what plaintiff contended was mechanical repairs during the first year of operation for the remaining seven trucks varied from .25¢ to 2.83¢ per mile, and the mileage on the trucks varied from 2,757 to 22,000 miles. At the time of trial the total mileage on the eight trucks was a little more than 888,000 miles.

Plaintiff offered to prove that the cost of mechanical maintenance of the trucks for 7½ years, or to January 17, 1968, was $69,028.85. This apparently included the expense incurred during the first year of operation which was otherwise in evidence. To show this cost, plaintiff offered in evidence eight bundles of invoices, one bundle for each truck, purporting to show repairs made on the trucks, after the expiration of the express warranties as to parts, and up to shortly before trial, which was approximately three years after the suit was filed. The invoices, although not qualified as business records, were admitted for the first year of operation of the trucks, but the remainder of the invoices were refused. Each bundle of invoices was offered as a unit without any attempt to relate the individual items to the alleged breach of warranty of fitness, and many of the individual items obviously could not be so related. For example, as to one truck the invoices show such items as "adjust head lights," and (when the truck was over one year old) "check and replace spark plugs," and "install new battery." Plaintiff also offered to prove that after the first year of operation twenty-one engines were replaced, and that on an average the engines lasted 29,834 miles. This obviously meant that at least thirteen of the replacements were of engines which were not in the trucks when they were received from Mendenhall. There was no offer of proof as to where the replacement engines were obtained, and plaintiff's petition does not include any alleged warranty as to these engines. Plaintiff next offered to prove that there had been fourteen motor "overhauls," but the offer did not indicate whether all of this work was on the original engines or some on replacements. In the offer of proof plaintiff detailed the number of clutches installed, carburetors overhauled and replaced, transmissions and differentials overhauled, new starters and batteries installed, and the number of times the engines were tuned. The offer of proof also included that the cost of mechanical maintenance for the 7½ years was 8.27¢ per mile. Plaintiff also offered to prove by a witness, qualified as an expert, that the normal cost of operation should be 3 to 4¢ per mile, that an engine should last from 75,000 to 100,000 miles, and that the reason plaintiff obtained such limited mileage was that in his opinion the engines were too small. However, with-

out setting out the circumstances in detail, there was no evidence, or offer of proof of evidence, upon which these opinions properly could be based.

Plaintiff's pleaded theory was that Mendenhall and Ford Motor Company knew the nature of its business and the use that plaintiff intended to make of such vehicles, and that they orally warranted the trucks to be fit and proper for such use, but when plaintiff attempted to use the trucks for the purpose they were purchased, they "could not be operated by plaintiff in its business without breaking down and requiring repairs to and replacements of various parts * * *." In the course of the trial, counsel for plaintiff stated that it was "not claimed that the trucks, themselves, were defective," but "plaintiff's case is predicated on the failure of the seller and the manufacturer to supply the plaintiff with trucks reasonably suitable for the plaintiff's purpose," and that the damages to which plaintiff was entitled was the cost of the "excessive repairs that plaintiff was required to incur in order to keep the trucks running."

One of the reasons the trial court directed a verdict was that plaintiff failed to make a submissible case. When we consider all the evidence admitted, and assume the admission of the evidence offered, including the expert testimony for which there was no proper foundation, we reach the same result.

■ There was no proof, or competent offer of proof, of any failure on the part of the trucks except that after the first year there resulted what plaintiff considered to be "excessive" maintenance costs. There was no showing that the repairs were necessary. In fact, plaintiff's counsel advised the trial court that it was not "any part of our case to prove these repairs were necessary." Also, there was no evidence, or competent offer of proof, from which it could be found that the repairs resulted from or were brought about as the result of the trucks being unable to perform the work

defendants represented they could. For example, there was no proof that although the trucks were represented to be able to haul a certain maximum weight, they could not do so. In fact, neither the weights hauled nor the represented capacity of the trucks were shown, and there was no evidence of the specified capabilities of the trucks and that the use of them was or was not within those capabilities. The essential question thus becomes: can the breach of warranty of fitness of eight trucks for a particular purpose be shown by proof only that during 7½ years of operation while being driven a total of 888,000 miles, they required frequent repair and maintenance? We hold it cannot.

■ A verdict in a warranty case, as in others, cannot be founded only on speculation and conjecture. Green v. Ralston Purina Company, Mo., 376 S.W.2d 119. From the evidence of plaintiff which was admitted and offered, it would be pure speculation and conjecture to conclude that the frequent repairs resulted from the inability of the trucks to do the work represented by defendants rather than from improper use by plaintiff or from other reasons. As in Green v. Ralston Purina Company, supra, plaintiff relies upon a variation of the *post hoc ergo propter hoc* method of proof. There the theory of plaintiff in a suit based on a warranty that chicken feed was a wholesome and fit food, was that before using the feed the flocks sustained only a 5% average mortality, but after using the food the mortality rate increased. It was held that this did not constitute "substantial evidence of causation," and we agree. In this case plaintiff showed that the "normal" cost of maintenance of trucks was 3 to 4¢ per mile, but that over a period of 7½ years the cost of maintenance of the eight trucks was approximately 8¼¢ per mile. Plaintiff did not show, or purport to show, that this increase in the cost of repairs resulted from being unfit for the particular purpose of hauling building supplies and material. In Poovey v. International Sugar Feed No. 2 Co., 191 N.C. 722, 133 S.E. 12, a suit for

breach of warranty of fitness of cattle feed, it was stated, "The mere sickness and death of the cows is not sufficient evidence in itself to establish a prima facie case of breach of warranty. The doctrine of 'res ipsa loquitur' does not apply to a breach of warranty."

Our conclusion that no submissible case was made, even when we consider offers of proof which were properly refused because of failure to qualify records for admission in evidence and failure to present the proper basis for opinion testimony, makes it unnecessary to rule on the effect of the disclaimer by defendant of all warranties other than the printed one on the back of the purchase orders.

The judgment is affirmed.

BARRETT, C., not sitting.

PRITCHARD, C., concurs.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

DONNELLY, P. J., MORGAN and FINCH, JJ., and FULLER, Special Judge, concur.