### JOHN MARTIN SMITH v. GULF OIL CORPORATION.

(Filed 29 January, 1954.)

**1. Evidence §§ 6, 26—**

Evidence that on a certain date three leaks were discovered in underground pipes connecting buried gasoline tanks to service station pumps, that the equipment was installed in rocky soil in ground that had been partially filled in, and that motor vehicles and trucks frequently drove over the buried equipment, *held* not to raise an inference or presumption that the leaks existed at the time the equipment was installed almost two years prior thereto.

**2. Negligence § 3½—**

The doctrine of *res ipsa loquitur* does not apply when the instrumentality causing the injury is not under the exclusive control or management of the defendant.

**3. Same—**

The operator of a service station made a contract with an oil company under which the company installed storage tanks, pumps and connecting

pipes, retaining title to all the equipment, and defendant was obligated to maintain the equipment in good condition and repair so long as he continued to use same.   *Held:* The doctrine of *res ipsa loquitur* does not apply to leaks discovered in the pipes connecting the storage tanks and pumps, since the instrumentality was not under the exclusive control of the company.

**4. Negligence § 19a (1)—Evidence held insufficient for jury on issue of defendant's negligence in installing gasoline equipment.**

Under the contract between plaintiff, a filling station operator, and defendant oil company, defendant agreed to install gasoline pumps and underground storage tanks with connecting pipes, and plaintiff contracted to use the equipment only for the sale of defendant's products and to keep the equipment in good condition and repair.   The evidence favorable to plaintiff tended to show that the underground pipes were installed in partially filled ground in rocky soil, that vehicles frequently drove over the underground equipment, that when one of the pumps was first used in the mornings it would run from five to six minutes before it would start pumping gasoline, that plaintiff later found there was a difference between the number of gallons of gasoline he purchased and the number of gallons he sold and was under the impression that defendant's truck drivers were not delivering to him the full quantity purchased, that some time later gasoline was found in a branch into which the terrain drained, and that almost two years after installation, when the pipes were uncovered, leaks were found in the ells of the underground pipes.   *Held:* The evidence was insufficient to be submitted to the jury on the issue of defendant's negligence in the installation of the equipment, the doctrine of *res ipsa loquitur* being inapplicable and the evidence raising no presumption that the leaks in the pipes existed at the time of installation.

**5. Same:—Evidence held insufficient on issue of defendant's negligence in failing to discover leaks in underground pipe.**

Evidence tending to show that, after the installation of gasoline pumping equipment by defendant, plaintiff reported a number of times the failure of one of the pumps to pump gasoline immediately it was put into operation, that each time defendant sent out men to work on the pump, and that more than a year later gasoline was found in a branch into which the terrain drained, and that leaks were discovered in the pipe connecting the underground tank to the pump, when the pipe was uncovered, with further evidence that plaintiff was under contract at his own expense to maintain equipment in good condition and repair and could have uncovered the pipes if he desired to do so, is *held* insufficient to be submitted to the jury on the question of defendant's negligence in failing to use due care to discover the leaks.

**6. Negligence § 17—**

The general rule is that an injury neither raises a presumption nor is it evidence of negligence.

**7. Trial § 23a—**

There must be legal evidence of every material fact necessary to support the verdict, and if there be no evidence of each such fact or if the evidence be so slight as not reasonably to warrant the inference of the fact in issue

SMITH *v.* OIL CORP.

or furnish more than material for a mere conjecture, the court will not leave the issue to be passed on by the jury.

**8. Election of Remedies § 1—**

The purpose of the doctrine of election of remedies is not to prevent recourse to any remedy, but to prevent double redress of a single wrong.

**9. Election of Remedies § 7—**

When a party elects which remedy he will pursue, such election is final and irrevocable, since the adverse party should not be twice vexed for one and the same cause.

JOHNSON, J., dissenting.

APPEAL by plaintiff from a judgment of nonsuit from *Rudisill, J.,* March Civil Term 1953. GUILFORD.

This is a civil action in which the plaintiff, operator of a service station, seeks to recover alleged damages for alleged leakage of gasoline from pipes at his station. The plaintiff declared upon two causes of action: (1) Breach of contract by the defendant in failing to install pipes so as to avoid leakage; (2) negligence of the defendant in installing the pipes to prevent leakage, and failure to use due care in discovering leakage. At the close of the plaintiff's evidence the court granted the defendant's motion to require the plaintiff to elect which cause of action he relied upon. The plaintiff elected tort as a cause of action.

Plaintiff's testimony tended to show these facts. He desired to purchase petroleum products from the defendant for resale at a service station in the City of Greensboro operated by him, and leased from his father, and he requested the defendant to loan and install equipment owned by the defendant for the better storage and handling of such products. For such purpose he and the defendant entered into a written agreement on 31 December 1949. The provisions of the agreement material in the case are these: (1) The defendant retained title of all equipment installed; (2) the equipment shall be used solely for handling defendant's products; (3) the plaintiff "shall at his own cost and expense maintain said equipment in good condition and repair so long as he shall continue to use the same."

Pursuant to the agreement the defendant furnished and installed the necessary equipment, including two 20 barrel underground tanks and two Bennett Computor Pumps, connecting the tanks to the pumps by means of pipes. The equipment was installed in extra rocky soil. The pipes were covered with dirt. The plaintiff was not present when the equipment was installed.

Plaintiff began operating the station about the middle of April 1950. He sold Gulf No-Nox (high test) and Good Gulf (regular) gasoline.

The plaintiff had no trouble with the No-Nox pump and the pipes leading to this pump. When he began operations the pump on the regular line the first time it was used in the morning would run anywhere from 5 to 6 minutes before it would start to pumping gas. The motor would run, but no gasoline would flow. At different intervals during the day the time the motor would run before it started to pump gasoline would vary, depending on how long the pump set. The plaintiff reported this to the defendant 12 or 15 times or more. Each time it was reported the defendant sent men out to work on the pump, but it was not corrected until the defendant uncovered the pipes and found a leakage, in February 1952.

In the Fall of 1950 the plaintiff found there was a difference in the amount of gasoline he sold and the amount he had bought from the defendant. He reported this to the defendant who advised him to keep a better check on the drivers delivering gasoline. The plaintiff was under the impression the drivers were not delivering as much gasoline as he was paying for.

In February 1952 the plaintiff inspected a small branch about 150 feet north of the station, and discovered gasoline in the branch. The branch is 2 or 3 feet wide, and the terrain between the station and the branch slopes downward at about 15 degrees. The soil from the station to the branch is a hard, claylike substance. The gasoline was bubbling in the branch.

Earl Redding was a witness for the plaintiff. The branch is about midway between his place and the plaintiff's station. In 1951 he found "oily stuff" on the waters of the branch. In February 1952 he went to this branch again, and saw bubbles with all the colors of the rainbow, which smelled a lot like gasoline.

Immediately after seeing this gasoline in the branch the plaintiff reported it to the defendant. The same day, which was Friday, the defendant sent there its pump mechanic, Mr. Gray. Gray went to the branch, got a can full of its water, put fire on the water, and it burned. He said "that's gasoline all right." Later that day two other employees of the defendant went to the branch, and they also "lit the water there."

On the following Monday the defendant sent two mechanics to the station. They dug up both pipe lines. On the regular line at an ell gasoline was shooting up about 10 inches when they uncovered it. About two feet on the same line at another ell gasoline was streaming down the pipe. The pipe on the regular line holds 6½ gallons between the first leak and the pump. On the high test line there was a small seepage at a filling. The soil around the pipes was wet—a match was applied to a handful of it, and it blazed up and started burning. After the lines had been repaired, and covered up the pump on the regular tank of gasoline started pumping gasoline immediately as soon as the motor began. The

defendant had done nothing to that pump after discovering the leaks and repairing them.

From the day the plaintiff began operating the station until the leaks were repaired in February 1952, he bought 82,328 gallons of gasoline from the defendant. During that time he sold 69,665 gallons. After allowing a half per cent for evaporation, the difference is 12,663 gallons. He paid the defendant 24c per gallon for this gasoline, and its value was $3,023.76.

On cross-examination of plaintiff he testified in substance as follows: He calculated the number of gallons which had leaked by adding the number of gallons shown by the invoices made by the defendant and subtracted the number of gallons sold by him. He determined the number of gallons sold from the tape of his adding machine cash register, upon which tape there were various other items. He distinguished the items of gasoline sold because the letter "F" was placed by each item of gasoline. The number of gallons sold was determined by dividing the amount of the item by the price per gallon of gasoline. The tape had been run through the machine twice, and sometimes three times. At times undesignated items were marked "F," and the designation of other items were changed to and from "F."

On redirect examination the plaintiff testified: "I bought $20,494.28 worth of gas from Gulf Oil Company. I sold $24,589.39 worth of gas. I added a mark-up of 19% to the amount of gas I bought from Gulf, and subtracted that from the amount of gas I sold. That gave me in dollars and cents the amount of gas that leaked out. In computing the amount in dollars and cents, I used an average selling price of regular gas."

Worth Moser, a witness for the plaintiff, testified in substance: I have installed and worked on suction pumps off and on ten years. I have used the pump on the regular gasoline line at plaintiff's station. It is an electrically operated suction pump. I saw the leaks in the line when it was uncovered—there were three leaks, which would cause the pump to run several minutes before it started sucking gasoline.

Mrs. J. M. Smith, wife of the plaintiff, M. M. Smith, his father, and Glenn Pittman testified as to the failure of the pump on the regular gasoline line to pump gasoline immediately it was started, and M. M. Smith and Glenn Pittman testified that they saw leakage when the lines were uncovered; and M. M. Smith testified in February 1952 he saw gasoline in the branch.

The plaintiff's evidence further tended to show that the pipes between the pumps and the tanks were placed in ground that had been partially filled in, and that motor vehicles and the Gulf truck drove over the spot where the broken ell that spouted gasoline was located.

A summation of the defendant's evidence tended to show the following: There was no leak in any ell or pipe or fitting when they were installed in April 1950. After the installation of the equipment by the defendant the pumps were primed and drew out gasoline. If there was a leak in either line when the pumps were primed, it would have been discovered. In February 1952 there was gasoline in the branch north of the station. In February 1952 the defendant uncovered the pipes to make repairs. No leak was found in the No-Nox pipe. In the Good Gulf pipe there was only one leak coming from a crack in the ell. The crack was in the threads. This leak was draining back on the line which was dripping from a coupling. It wasn't leaking much—just moisture seeping out. When first uncovered you could wipe it off with a rag. When you cranked the pump up and when the motor was running, it caused it to leak a little more. When the wrench was put on the ell to take it off, it leaked more because it made it crack more. After the wrench was put on the pipe, gasoline gushed out. The ell was replaced with a new one. The ground around the leak was wet and smelt of gasoline. A break in the line between the pump and the tank would cause the pump to jerk on a start, hesitate. It would not make the pump run any length of time before it sucked up gasoline. The pump could not draw air. If it drew air, the pump would not operate and would not put out any gasoline. The plaintiff complained to the defendant several times about the operation of the Good Gulf pump. In February 1952 the plaintiff said something about the manner in which the defendant's mechanics installed the equipment. C. L. Osmint, who was stipulated by counsel to be an expert witness on Bennett Gasoline Pumps testified as follows: "The pump itself creates the power to suck the gasoline up through the line and out the nozzle. Now, in cases where you have a broken line and you are drawing air through the line, air, being much lighter than liquid, is drawn first, the liquid being heavier than air, and the pump draws from the source of the least resistance and will draw air into the line. This air, when it is thrown into the air chamber by the pump, will not hold the float up; it allows the float to come down, operating the valve mechanism of this air eliminator. When this valve is opened by the float, it allows the air to escape through an escape port or vent tube, which is vented to the recess that the nozzle is set into. Any time a service man is servicing a pump of this type, if the pump is not pumping, his first action usually is to put his ear to this vent which escapes into the atmosphere to check to see if there is any air coming out. Of course, he knows if there is, there is a break in the line."

At the close of the plaintiff's evidence the defendant moved for judgment of nonsuit, which was denied, and the defendant excepted. At the

close of all the evidence the defendant renewed its motion for nonsuit, which was allowed, and the plaintiff excepted.

From the judgment entered the plaintiff appeals to the Supreme Court.

*J. J. Shields for plaintiff, appellant.*
*Hoyle & Hoyle for defendant, appellee.*

PARKER, J. The plaintiff contends that considering the evidence in the light most favorable to him, it makes out a case for the jury that the defendant was negligent in failing to install the pipes so as to prevent leakage. Considered in that light the evidence tended to show these facts: In the middle of April 1950 the defendant installed the pipes, pumps, etc., at his filling station. The pipes were installed in partially filled in ground, extra rocky soil, and covered with dirt. Automobiles and the Gulf truck frequently drove over the place. The plaintiff had no trouble with the No-Nox pump. When he began operations the pump on the Good Gulf line the first time it was used in the morning would run anywhere from 5 to 6 minutes before it would start to pumping gasoline. When the Good Gulf line was uncovered in February 1952, it had three leaks in it, which would cause the pump to run several minutes before it started to sucking gasoline. In the Fall of 1950 the plaintiff first found out there was a difference between the number of gallons of gasoline he paid for and sold. He was under the impression the truck drivers were not delivering to him the number of gallons of gasoline he was buying. In February 1952 the pipes were uncovered and three leaks were discovered in the Good Gulf pipes, and gasoline was found in a branch about 150 feet north of the station. The terrain between his station and the branch slopes downward at about 15 degrees. The equipment installed was not under the exclusive control and management of the defendant.

The evidence tending to show that three leaks were discovered in the Good Gulf line in February 1952, does not raise an inference or presumption that the same state of facts existed in April 1950. *Childress v. Nordman,* 238 N.C. 708, 78 S.E. 2d 757, where numerous cases are cited.

We are of the opinion that the evidence does not make out a case for the jury on this contention, unless the doctrine of *res ipsa loquitur* applies.

The plaintiff invokes this doctrine. The principle of *res ipsa loquitur* has been so often stated by this Court, and so recently in *Young v. Anchor Co., ante,* 288, 79 S.E. 2d 785, by *Devin, C. J.,* where the cases are assembled, that it needs no restatement. The plaintiff cites in support of his argument on this point these cases from our Reports: *Harris v. Mangum,* 183 N.C. 235, 111 S.E. 177; *Saunders v. R. R.,* 185 N.C. 289, 117 S.E. 4; *Springs v. Doll,* 197 N.C. 240, 148 S.E. 251; *Howard v. Texas Co.,* 205 N.C. 20, 169 S.E. 832; and *Covington v. James,* 214 N.C. 71, 197 S.E. 701.

The doctrine does not apply when the instrumentality causing the injury is not under the exclusive control or management of the defendant. *Harris v. Mangum, supra; Saunders v. R. R., supra; Springs v. Doll, supra; Howard v. Texas Co., supra.*

The cases relied upon by the plaintiff are not in point. In *Harris v. Mangum,* and *Howard v. Texas Co.,* the instrumentalities causing the damage were under the exclusive control or management of the defendants; *Covington v. James* is a malpractice case; in *Saunders v. R. R.,* it was held that the doctrine did not apply as the thing causing the injury was not under the exclusive control of the defendant; and in *Springs v. Doll,* it was held the doctrine did not apply to an injury from a skidding automobile. Under our decisions the doctrine of *res ipsa loquitur* does not apply to the facts of this case.

The plaintiff also contends that the evidence makes out a case for the jury of negligence on the part of the defendant in failing to use due care to discover the leakage.

The contract between the plaintiff and the defendant provides that the plaintiff "shall at his own cost and expense maintain said equipment in good condition and repair so long as he shall continue to use the same."

In support of his contention the defendant cites one case, *Andrews v. Oil Co.,* 204 N.C. 268, 168 S.E. 228 (trial of case by a judge and jury found without error in a *per curiam* decision in 206 N.C. 900, 172 S.E. 526). In the 204th Report the case was before this Court on the overruling of a demurrer to the complaint.

The complaint has these words: "The said service station was equipped with three gasoline tanks buried under ground and covered with concrete . . . Plaintiff had no right to tear up concrete and inspect the tanks which were the property of the defendant, and no duty to do so, and relied upon the assurances made to him by the defendant in continuing to let the defendant put gasoline into the said tanks." The plaintiff in his brief quotes from the case in the 204th Report as follows: "The defendant was in possession of a gasoline filling station. It had buried underground and covered with concrete three gasoline tanks for the purpose of housing gasoline. In the pipes of one gas tank was a leak which was unknown to the plaintiff. The defendant had sole control of the tanks and pipes. They were installed by and the property of the defendant. The defendant knew or, in the exercise of due care, ought to have known of the leak." This quotation is not *verbatim.* The opinion shows that the Court used these words: "The defendant was in possession of a gasoline filling station. It had buried underground, concealed in the earth and covered with concrete, three gasoline tanks for the purpose of housing gasoline. Two of these had one gasoline pump each and the other had two gasoline pumps, connected with the tank by underground pipes through a T-joint.

In the pipe at the T-joint to the gasoline tanks was a leak, which was unknown to plaintiff. Defendant had the sole control over the tanks, pipe and T-joint. They were installed by and the property of defendant. Defendant knew, or in the exercise of due care ought to have known, of the leak." This case does not support the defendant's contention.

The evidence tends to show that the plaintiff reported to the defendant 12 or 15 times or more the failure of the pump on the Good Gulf line to start pumping gasoline immediately the motor on the pump was put in operation, and each time the defendant sent men out to work on the pump. That when gasoline was found in the branch on a Friday in February 1952, the defendant the same day sent a man out, and on the following Monday the defendant uncovered the pipes, found leaks and repaired them. Under the contract the plaintiff at his own expense was to maintain the equipment in good condition and repair so long as he continued to use it. The plaintiff could have uncovered the pipes by removing the dirt, if he had desired to do so.

We think the evidence is not sufficient to carry the case to the jury that the defendant failed in the exercise of due care to discover the leaks in the pipes. The general rule is that an injury neither raises a presumption nor is it evidence of negligence. There is a well recognized exception to this rule which has no application to this case. *Shaw v. Mfg. Co.,* 143 N.C. 131, 55 S.E. 433; *Orr v. Rumbough,* 172 N.C. 754, 90 S.E. 911; *Mills v. Moore,* 219 N.C. 25, 12 S.E. 2d 661; *Patton v. R. R.,* 179 U.S. 658, 45 L. Ed. 361. "There must be legal evidence of every material fact necessary to support the verdict and the verdict 'must be grounded on a reasonable certainty as to probabilities arising from a fair consideration of the evidence, and not a mere guess, or on possibilities.' " *Mills v. Moore, supra.* In *Mfg. Co. v. R. R.,* 233 N.C. 661, 65 S.E. 2d 379, the Court quotes these words from *Poovey v. Sugar Co.,* 191 N.C. 722, 133 S.E. 12: " 'The rule is well settled that if there be no evidence, or if the evidence be so slight as not reasonably to warrant the inference of the fact in issue or furnish more than material for a mere conjecture, the court will not leave the issue to be passed on by the jury.' "

At the close of the plaintiff's evidence the Court, upon motion of the defendant, required the plaintiff to elect what cause of action he relied upon in seeking damages, breach of contract or for negligence. The plaintiff selected "tort as a cause of action." The purpose of the doctrine of election of remedies is not to prevent recourse to any remedy, but to prevent double redress for a single wrong. The plaintiff having made his election it is final and irrevocable: the underlying basis of the rule being the maxim which forbids that one shall be twice vexed for one and the same cause. *Friederichsen v. Renard,* 247 U.S. 207, 62 L. Ed. 1075; *U. S. v. Oregon Lumber Co.,* 260 U.S. 290, 67 L. Ed. 261; 18 Am. Jur., Election

of Remedies, Sec. 20; 28 C.J.S., Election of Remedies, Sec. 29. "Where he has two remedies, he may choose between them and select that one which he deems the best for him, but he must abide the result of his choice. This is not only legally but morally right." *Baker v. Edwards,* 176 N.C. 229, 97 S.E. 16.

The judgment of the Superior Court is
Affirmed.

JOHNSON, J., dissenting: The installation here complained of was made by the defendant in the Spring of 1950. The evidence discloses that one pump unit did not function properly the first day. The pump would run five or six minutes before it would start pumping gas. This indicated that air was getting in the gas line somewhere below the pump. It is evidence of faulty installation. It would seem that the defendant's repair-man should have been put on notice that this condition likely came from a leak in the gas line, and in the exercise of due care he should have sought out the leak and repaired it. Yet, this was not done. The plaintiff repeatedly notified the defendant—"12 or 15 times or more"—that the pump was not working properly, and each time the defendant sent men out to work on the pump. These repairmen failed to locate and correct the trouble. Finally, the leak was located and repaired in February, 1952. Conceding that under the contract it was the duty of the plaintiff "to maintain the equipment," even so, when the defendant undertook from time to time to correct the faulty installation as reported by the plaintiff, and sent men out to the plaintiff's place to work on the pump, the defendant became chargeable with failure of these men to exercise due care in locating the leak. This assumption of responsibility on the part of the defendant dilutes the legal effect of the contract provision which required the plaintiff to maintain the equipment. It is elemental that the law imposes an obligation upon everyone who attempts to do anything, even gratuitously, for another, to exercise due care and skill in the performance of the undertaking, and for the nonperformance of such duty an action will lie. Nor may a duty voluntarily assumed be carelessly abandoned without incurring liability for injury resulting from the abandonment.

I am constrained to the view that the evidence relied on by the plaintiff is sufficient to support the inference that the defendant was actionably negligent, both in respect to the original installation and for failure to exercise due care in discovering the leak after the plaintiff notified the defendant about the malfunctioning pump. It seems to me the plaintiff made out a *prima facie* case on each of these grounds, and this, without calling to his aid the principle of *res ipsa loquitur.* Therefore my vote is to reverse the judgment of nonsuit.