[No. 38942.     Department Two.     May 23, 1968.]

THE STATE OF WASHINGTON, on the Relation of The Barb
Restaurants, Inc., et al., Respondents, v. THE STATE BOARD
AGAINST DISCRIMINATION et al., Appellants.*

The Attorney General, Morton M. Tytler and Charles B.
Roe, Jr., Assistants, for appellants.

John M. Schermer and Richard W. Pierson (of Monhei-
mer, Schermer, Van Fredenberg & Smith), for respondents.

LANGENBACH, J.†—This is an appeal from a writ of prohi-
bition issued on behalf of The Barb Restaurants, Inc. (here-
inafter referred to as the restaurant), against the Washing-
ton State Board Against Discrimination (hereinafter re-
ferred to as the board). The writ prevented the board from
proceeding to a public hearing on complaints against the
restaurant.

After the proceedings were instituted by the board, an

*Reported in 441 P.2d 526.

†Judge Langenbach is serving as a judge pro tempore of the Su-
preme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitu-
tion.

alternative writ of prohibition was issued. Thereafter, the parties, through their counsel, entered into a comprehensive stipulation which established the basic facts upon which the action proceeded to a final determination. From such stipulation, the following facts are disclosed.

The restaurant is a Washington corporation which operates 14 different restaurants in the state. On April 1, 1965, it purchased a restaurant known as Les Teagle's on Aurora Avenue, North in Seattle. At that time, Teagle's staff included six Caucasian waitresses. The staff was retained in their employment following this purchase.

At the end of the shift on the evening of May 1, 1965, all six of these waitresses were discharged without any prior notice. Some of them were advised that their discharge was because "changes were going to be made." One was told that the restaurant was going to have Oriental waitresses. Some were offered references and help to find similar employment in other Barb restaurants in Seattle or elsewhere. The six Orientals who replaced them had been working in The Polynesian, another Barb restaurant in Seattle. All of these waitresses, both Oriental and Caucasian, were members of the same waitresses' union, which acted as their representative for the purposes of collective bargaining.

The Barb restaurant was a member of the Washington State Restaurant Association, which acted as its collective bargaining representative and which association was a party to the collective bargaining agreement involved in this action.

Mrs. Lenora Wells was the night business agent for the waitresses' local union and had authority to represent the local in the grievance procedure contained in the collective bargaining agreement.

One waitress telephoned Mrs. Wells on Sunday, the day following the discharges, and declared that this was discrimination, and asked what the union could do for her. Mrs. Wells stated she did not know, but that she would talk to the union officers and the attorney on Monday. The union attorney informed her the collective bargaining agreement had no provision prohibiting discharge because

of racial discrimination, but only that a waitress could not be discharged except for "just cause." (This term is not defined in the agreement.)

This collective bargaining agreement was admitted as an exhibit. Its pertinent provisions are set forth as a guide as to what follows:

Article XVII. Discharge, Notice and Reporting Pay

17:01 Discharge for Cause: The Employer shall have the right to discharge any employee for just cause.

17:02 Reason for Discharge: Any employee being discharged shall be given the reasons therefor, . . . .

. . . .

Article XXI. Dispute Settlement Machinery

21:02 Procedure to be Followed: All grievances, disputes and differences of opinion between the parties hereto which arise during the term of this Agreement, whether or not they involve question of interpretation and application of this Agreement . . . shall be resolved according to the following procedure.

(1) The matter will first be taken up between the Employer and the representative of the Local Union involved.

(2) In the event that the matter cannot be satisfactorily resolved in step number (1) above, the matter next shall be taken up between representatives of the Local Union involved and the Labor Counsel of the appropriate Association. The decision of the Labor Counsel shall be binding on all members of the respective Associations.

(3) In the event that the matter cannot be satisfactorily resolved in step number (2) above, then it shall be referred to arbitration before an impartial arbitrator selected by the parties . . . .

21:03 Expenses: The expenses of the impartial arbitrator shall be borne equally by both parties. The decision of the impartial arbitrator shall be final and binding.

On Monday, Mrs. Wells took the first step in the grievance procedure. She conferred with the manager of the restaurant. She seemed to limit her discussion to the matter of "just cause." The manager declined to accede to her request.

On Monday evening, Mrs. Wells attended a meeting of five of the waitresses, in the home of one, where the matter

of discharge was discussed. The matter of racial discrimination was also considered. (The other waitress is not involved in this matter.)

On Tuesday, Mrs. Wells took the second step in the grievance procedure, namely, she conferred with the labor counsel for the restaurant association and had a grievance hearing set for May 10, 1965, and the restaurant was so notified. Mrs. Wells presented the case of the waitresses before the labor counsel on the basis that there was no just cause for their discharge. The labor counsel denied the grievance, and she then requested arbitration (step 3) under the collective bargaining agreement.

During the arbitration proceedings, the union and the restaurant appeared by their respective counsel. They agreed upon an impartial arbitrator. The hearing was held June 14, 1965. The arbitrator heard some testimony and a stipulation for arbitration and statement of questions involved was presented. The position of the union was stated, and briefs of the parties on the issues were presented. On July 9, 1965, the arbitrator issued an opinion in which counsel for the restaurant concurred and the attorney for the union dissented. This opinion included an award to the waitresses of one day's pay, as required by the collective bargaining agreement, when proper notice was not given prior to discharge. But it denied them reinstatement and back pay as demanded by the union.

During all of these proceedings, Mrs. Wells and the union had been endeavoring to secure the reinstatement of the waitresses, with retroactive pay. Had this relief been granted at any of the steps required to be taken, this entire matter would have been fully adjusted. Nothing then would remain to be done.

In the meantime, on the 5th, 6th, and 7th of May, the five waitresses had filed written complaints with the board, alleging that they had been discharged and discriminated against because of race.

Upon receipt of these complaints, the board assigned them to Mr. Mansfield, an investigator, for attention. May 26, 1965, he made a report of certain findings that there was

reasonable cause for believing a discriminatory practice had been committed. On May 28th he mailed a copy of his findings to the restaurant along with terms of settlement. The restaurant declined to negotiate with Mansfield, maintaining that the board had no jurisdiction over the complaints. August 3, 1965, he made a further finding that no agreement could be reached. On the same date, he certified the entire file to the chairman of the board for a public hearing.

Counsel for the restaurant requested the chairman to consider the contention that the board had no jurisdiction over the complaints. The chairman agreed to procure a legal opinion. He was advised by an assistant attorney general that the board had jurisdiction, and he, too, recommended a public hearing. The chairman later signed an order convening a hearing tribunal and fixed a notice of hearing. When further delay was not possible, counsel for the restaurant procured an alternative writ of prohibition and this proceeding ensued.

There are 14 assignments of error pertaining to certain findings, given and rejected, and to certain conclusions, given and rejected.

Appellant stated in its brief:

The Issue: Do the Facts of This Case Bring the Waitresses Within the Election Provision of RCW 49.60.020?

. . . [T]his appeal presents a single question: Do the stipulated and undisputed facts of this case bring the waitresses within the operation of the election provision of RCW 49.60.020?

This was the sole issue before the trial court, and it is the sole issue on appeal.

. . . [T]he question may be divided into two parts:

(1) Was the grievance proceeding based on a violation of the waitresses' civil rights?

(2) If so, was it the waitresses who elected to try their civil rights there?

The pertinent part of RCW 49.60.020 is as follows:

Nothing contained in this chapter shall be deemed to repeal any of the provisions of any other law of this state relating to discrimination because of race, color, creed, or

national origin. Nor shall anything herein contained be construed to deny the right to any person to institute any action or pursue any civil or criminal remedy based upon an alleged violation of his civil rights. However, the election of a person to pursue such a remedy shall preclude him from pursuing those administrative remedies created by this chapter.

Appellant asserted in its answer a denial (1) that the collective bargaining grievance procedure was based on an alleged violation of the waitresses' civil rights, and (2) that the waitresses *elected* to pursue the grievance procedure. The trial court, from an examination and scrutiny of the entire record, decided adversely to these contentions.

In unchallenged findings, the court determined that Mrs. Wells was the business agent of the waitresses' union; she had been alerted the next day after their discharge; she immediately investigated their rights under the collective bargaining agreement and conferred with the union officers and the attorney. She then proceeded, step by step, through the procedure prescribed by the collective bargaining agreement in seeking positive relief for the waitresses; namely, their reinstatement with compensation and employment benefits. In addition, the union attorney proceeded with the grievances through the arbitration processes of that agreement.

Unchallenged finding No. 15 states:

That in accordance with agreement procedures set out in Exhibit 2, an impartial arbitrator, Mr. J. B. Gillingham, was selected and the matter proceeded to arbitration before Mr. Gillingham on June 14, 1965; that the aggrieved waitresses testified as more fully appears from the transcript of the testimony of the arbitration and in each instance testified that they believed they had been discriminated against by virtue of their being Caucasians as against being Orientals. That the relief sought in the arbitration and the remedy requested was reinstatement of each of the waitresses and back pay at their regular rate of pay, less whatever they had earned in the interim. That the written report and award of the arbitrator, Mr. J. B. Gillingham, denied the relief sought, to wit, back pay and reinstatement.

Further in the collective bargaining agreement, in section 21:02, it provided that the decision of the labor counsel (of the restaurant association) is final and binding upon the employer involved. If the union and employee were satisfied in that event, there was no right of appeal for the restaurant. However, if the union was not satisfied, it had a right of appeal by giving notice of election for arbitration, which was done in this instance.

From the very first notice to the union representative, the next day after discharge, the question of discrimination was being discussed. It was considered not a "just cause" for discharge. There was no other issue before any of the parties in any of the proceedings subsequent to that time. The waitresses so knew and understood these proceedings. Mrs. Wells admitted that she had been asked by these waitresses about racial discrimination. She stated their working agreement did not cover racial discrimination, only discharge for "just cause." She claimed she represented only the union—yet her activities centered on the complaint which had been made to her the very next day. She would have had no knowledge of these matters in the absence of the complaints made directly to her. There was no objection on the part of any waitress to the activities of Mrs. Wells in her attempts to recover the same relief through union channels. Under the facts and circumstances, only civil rights were involved in the union negotiations.

Unchallenged finding of fact No. 8 states:

Mrs. Wells had authority to act as a representative of Waitresses Local No. 240 in the grievance procedure provided in Article 21:02 of the collective bargaining agreement, . . . .

Yet appellant cited as error this same statement (in effect) in finding No. 13; and the same applies to the error claimed in finding No. 16, where the same agency of Mrs. Wells is again attacked.

A further attack on finding No. 16 is leveled against this portion:

That the relief sought before the Washington State Board Against Discrimination was for reinstatement and

back pay and that the relief sought and the remedy pursued under the labor contract grievance procedure and the relief sought and the remedy pursued under the complaints of the Washington State Board Against Discrimination are the same and identical.

There does not seem to be any question about the similarity of the relief sought in these two separate approaches to the same matter.

Finding No. 17 is assailed because it states that the board, through its investigator, had "made a demand upon" the restaurant for the same relief, to wit, "reinstatement of said waitresses and payment of back pay," which the restaurant refused to sign. Had it done so, this controversy would have been ended then and there.

A part of finding No. 22 is challenged because it states, "They [the waitresses] did not refuse to participate or testify and that by so doing they elected to proceed in that manner." The testimony and proof clearly sustained that finding.

As originally phrased by appellant, one question was posed: Was the grievance proceeding based on a violation of the waitresses' civil rights? But what other rights were involved? Their qualifications and activities as waitresses were never challenged. The only reason given by the restaurant was that it desired to make a change in decor, to upgrade the quality of the premises, and to design it with an Oriental atmosphere. It sought to use its Oriental waitresses from another of its restaurants to achieve this result. Thus, only the substitution of Oriental for Caucasian waitresses was involved—all members of the same union. If there was any cause, any "just cause," this was the "cause."

■ Under no other possible theory could negotiation rights of the union bargaining contract be involved. The union must act through its representatives; likewise, the waitresses could act only through their representatives— their business agent and the other union officers and attorneys. This they proceeded to do from the very beginning. It was only when they were denied relief under their bargaining agreement that they turned their attention to the

relief which might be granted by the board. They were thus pursuing two parallel courses of civil action to accomplish a remedy for a single possible violation of civil rights, namely, the right to obtain and hold employment without discrimination. RCW 49.60.030(1). This right might be enforced either under the union contract or by civil action, but not by both.

■ RCW 49.60.020, in effect, requires an "election of remedies," which has been defined in Black's Law Dictionary (4th ed. 1951), at 609, as follows:

An "election of remedies" is choosing between two or more different and coexisting modes of procedure and relief allowed by law on the same state of facts. Pacific Mut. Life Ins. Co. of California v. Rhame, D.C.S.C., 32 F. Supp. 59, 63; Doggett Lumber Co. v. Perry, 212 N.C. 713, 194 S.E. 475, 478.

When complaint was made to the union, which was permitted to pursue all steps of the collective bargaining agreement, an election was thereby made by the waitresses to seek a remedy alternative to that provided by RCW 49.60.020. The complaints to the union and to the board were both based on the same set of facts, and in each case identical relief was sought.

It is very understandable why these waitresses should have primarily pursued their "rights" under the union bargaining contract—it was informal, it was speedy, it was expeditious, and it was inexpensive. Upon discovery of the absence of a "just cause" a remedy and appropriate relief were immediately at hand. However, once the waitresses obtained an impartial review of their grievances, the policy and language of RCW 49.60.020 does not permit a "second try." The reason for this rule has been stated in *Smith v. Gulf Oil Corp.*, 239 N. C. 360, 368, 79 S.E.2d 880 (1954):

The purpose of the doctrine of election of remedies is not to prevent recourse to any remedy, but to prevent double redress for a single wrong. The plaintiff having made his election it is final and irrevocable: the underlying basis of the rule being the maxim which forbids that one shall be twice vexed for one and the same cause. *Friederichsen v. Renard*, 247 U. S. 207, 62 L. Ed. 1075; *U. S. v. Oregon*

*Lumber Co.,* 260 U. S. 290, 67 L. Ed. 261; 18 Am. Jur., Election of Remedies, Sec. 20; 28 C.J.S., Election of Remedies, Sec. 29. "Where he has two remedies, he may choose between them and select that one which he deems the best for him, but he must abide the result of his choice. This is not only legally but morally right." *Baker v. Edwards,* 176 N. C. 229, 97 S. E. 16.

It was admitted that the substitution of men waiters would have been "just cause" for the replacement of these waitresses. Yet it is claimed that the substitution of other female members of the same union, presumably possessing the same classification of qualifications, was not "just cause." The restaurant desired to change the entire atmosphere of the premises from Occidental to Oriental in order to meet active competition with similar establishments in the same general area of Seattle. It had offered these waitresses similar employment in other branches of its business in the city of Seattle, but such offers were rejected.

The waitresses were not denied a right of employment and work, except in this particular location under these particular conditions. They had the alternative of employment by the restaurant in other of its operations under the same working conditions. This they chose deliberately not to do, and sought relief through the machinery of their own union. Having been denied that relief, they sought the same results in this supplementary proceeding. This they were not entitled to do; they had made an "election of remedies" and consequently were bound by that choice.

Under these facts and circumstances, the trial court was legally justified in its conclusions and judgment. That judgment is now affirmed.

HILL, HUNTER, HAMILTON, and McGOVERN, JJ., concur.